# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1146

_____

Jon D. Katzenmeier,                          *
                                             *
    Plaintiff - Appellant,               *
                                             *
Julie Katzenmeier,                           *
                                             *
    Plaintiff,                           *  Appeal from the United States
                                             *  District Court for the
v.                                           *  Southern District of Iowa.
                                             *
Blackpowder Products, Inc., also             *
known as Connecticut Valley Arms;            *
Dikar S. Coop., LTD,                         *
                                             *
    Defendants - Appellees.              *

_____

Submitted: January 11, 2010
Filed: December 10, 2010

_____

Before LOKEN,[1] Chief Judge, JOHN R. GIBSON, and WOLLMAN, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

_____

[1]The Honorable James B. Loken stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2010. He has been succeeded by the Honorable William Jay Riley.

Appellant Jon D. Katzenmeier was injured when a muzzleloader rifle manufactured and distributed by Blackpowder Products, Inc., (Blackpowder) and Dikar S. Coop. LTDA, exploded when he fired it for the first time. Dikar, a Spanish business organization, designs and manufactures muzzleloading firearms, and exclusively exports to Blackpowder, its U.S. subsidiary, muzzleloader rifles to market and sell to consumers in the United States.[2] Katzenmeier brought a product liability action, and his wife, Julie, asserted a claim for loss of consortium. The case was tried to a jury. At the conclusion of Katzenmeier's case, the district court[3] dismissed Julie Katzenmeier's claim. The jury returned a verdict in favor of Dikar/BPI. Katzenmeier appeals several evidentiary issues. He argues that the district court erred in refusing to admit evidence of substantially similar incidents concerning Dikar/BPI muzzleloaders. Katzenmeier further argues that the district court erred in admitting Dikar's evidence regarding marks made on the barrel of the gun during the manufacturing process. Lastly, Katzenmeier argues that the district court erred in allowing Dikar/BPI's experts to testify that Katzenmeier possibly may have used an improper propellant in the rifle.[4] We affirm.

---

[2]The relationship between Dikar and Blackpowder is not at issue in this case, and neither party suggests any distinction between the parties with regard to liability. The district court referred to appellees collectively as "Dikar/BPI." We will do the same, except when individual references are needed for clarity.

[3]The Honorable Ross A. Walters, United States Magistrate Judge for the Southern District of Iowa.

[4]Although Katzenmeier, in the "Statement of Issues Presented For Review" portion of his brief, asserts that the district court erred by refusing to admit evidence of foreign law with respect to testing civilian firearms, he does not include the issue in the "Argument" section. As the district court noted, evidence of foreign regulations in a case governed by domestic law has been found excludable because it likely leads to confusion of the jury. Hurt v. Coyne Cylinder Co., 956 F.2d 1319, 1327 (6th Cir. 1992) (citing Deviner v. Exectrolux Motor, AB, 844 F.2d 769, 773-74 (11th Cir. 1988) (foreign legal standards are excludable in products liability cases)).

I.

Ronald Katzenmeier, Jon Katzenmeier's father, purchased the muzzleloader rifle in question, a Kodiak Magnum ("the Kodiak"), from an Ace Hardware store in Salina, Kansas, and gave it to Katzenmeier as a Christmas gift in December 2004. On October 2, 2005, when Katzenmeier loaded the gun with a maximum magnum charge of three 50-grain pellets of powder and attempted to fire the gun for the first time, it exploded causing injuries to his head, face, and right hand.

Katzenmeier's theory at trial was that the gun failed because the breech plug "stripped[]" loose due to the formation of the barrel. To show this, Katzenmeier put forth testimony that he properly loaded the Kodiak with the specified amount and type of propellant and that an inadequate engagement between the threads of the barrel and the breech plug caused the failure. Dikar/BPI contended that excess pressure from a higher than proper load caused the failure. Dikar/BPI also specifically rebutted Katzenmeier's theory that the company misleadingly indicated that it had "proof tested"[5] the Kodiak by placing the emblem of the "House of Eibar," a Spanish government proof house, which proof tests firearms manufactured in Spain. The firearms that Dikar sends to the United States are not proof tested.

The jury returned a verdict in favor of the defendants on all of Katzenmeier's claims.

_____

[5]A proof test is a test in which a firearm is fired with an overpressure load "to evaluate the performance of [a] gun if an incorrect and excessive amount of ammunition is utilized by the end user." Dikar Procedures Manual § 4.2.1. Dikar/BPI asserts that the United States does not require proof testing, and that there is not a proof house in the United States. Katzenmeier does not disagree.

II.

A.


Katzenmeier contends that the district court erred by excluding evidence of other muzzleloader failures, because there are substantial similarities between the other failures and this one.  Dikar/BPI filed a motion in limine before trial seeking to exclude evidence of these other incidents as dissimilar.  The district court granted the motion.  Nonetheless, during trial, Katzenmeier made offers of proof as to two muzzleloaders, one belonging to Eric Zenger and the other to Troy Cashdollar.  But as the district court explained in its written order granting the motion in limine:

> for another incident involving a muzzleloader manufactured and sold by defendants to be admissible as substantially similar to Mr. Katzenmeier's, the incident should be one in which (1) a threaded connection between the breech plug and the rear of the breech failed, resulting in the ejection of the breech plug upon firing and (2) the threads in the breech were formed by the same rolling tap manufacturing process allegedly defectively performed in this case.

We review a district court's evidentiary rulings for abuse of discretion, giving substantial deference to the district court's rulings.  Ferguson v. United States, 484 F.3d 1068, 1074 (8th Cir. 2007).


We affirm the district court's ruling that the Zenger and Cashdollar incidents are not "substantially similar" to the Kodiak.  Unless the facts and circumstances of other incidents are "substantially similar," such evidence is inadmissible because admitting such evidence could "raise extraneous controversial issues, confuse the issues, and be more prejudicial than probative."  Lovett v. Union Pac. R.R. Co., 201 F.3d 1074, 1081 (8th Cir. 2000).

-4-

First, the Cashdollar and Zenger muzzleloaders involved different breech plugs than the Kodiak: the breech plugs were different in length and thread size than the Kodiak.  The Kodiak also involved internal rolled threads, which Dikar did not begin manufacturing until around 2003; the Cashdollar and Zenger muzzleloaders were made using cut threads before then.  Next, Cashdollar and Zenger's muzzleloaders were a different model and design than in this case.  The Kodiak was manufactured in 2004 and consists of a falling block, stand-alone model.  By contrast, the Zenger gun includes a two-piece design with a barrel and receiver silver-soldered together; and the Cashdollar muzzleloader, known as an Eclipse, had a monoblock design.  Lastly, the circumstances surrounding the incidents vary:  Zenger purchased his gun two years after the gun had been recalled and used it for two years before his incident; Cashdollar shot his gun a "couple of hundred " times.  Based on our review of the record, we are satisfied that the incidents were not "substantially similar" to Katzenmeier's accident, and the district court did not abuse its discretion by refusing to admit the evidence.

## B.

We next turn to whether the district court erred in admitting testimony from Dikar executives to explain why the company placed the emblem of the House of Eibar on the barrel of Katzenmeier's gun during the manufacturing process.  Specifically, Katzenmeier argues that the testimony of Dikar's quality manager Aitor Belategi and of Dikar's general director Jon Muniategui contain hearsay. When asked for the policy decision or reason as to why Dikar did not proof test the guns, Belatagi explained that "This is not our company's decision.  This is the decision of the Proofhouse of Eibar.  We must do what the proofhouse tells us to do."  Similarly, Muniategui explained in his deposition testimony that Dikar's purpose in applying the House of Eibar emblem to its barrels was that "the proof house told us to do that." Before each of these witnesses' testimony was introduced, the court gave a limiting

instruction. The jurors were not to consider the testimony for the truth of the matter asserted.

Federal Rule of Evidence 801 defines hearsay as a "statement, other than one made by a declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "Instructions to an individual to do something are . . . not hearsay . . . because they are not declarations of fact and therefore are not capable of being true of false." United States v. Reilly, 33 F.3d 1396, 1410 (3d Cir. 1994) (citations omitted).

A review of the record shows that Dikar/BPI did not offer this testimony for the truth of what the proof house said, but rather to demonstrate the reasons for the company's marking procedures. Accordingly, the district court properly admitted the testimony because it was not hearsay. See Fed. R. Evid. 801. The district court advised the jury to use the testimony for this limited purpose. Katzenmeier has not met his burden to show that the district court abused its discretion by admitting this evidence because juries are presumed to be able to follow and understand the court's instructions. See United States v. Sandstrom, 594 F.3d 634, 645 (8th Cir. 2010) ("[J]uries are presumed to follow their instructions.") (internal citations and quotations omitted). For these reasons, the district court did not abuse its discretion in admitting Belatagi's and Muniategui's testimony for this purpose.

C.

Lastly, Katzenmeier argues that the district court erred in allowing testimony from Dikar/BPI experts, which allowed the jury to speculate that Katzenmeier possibly used smokeless powder or some other improper propellant in the muzzleloader. His brief contains no record citations to the allegedly improper

testimony, and we cannot locate any expert testimony that would lead to such speculation. Katzenmeier does point to a motion in limine he filed before to prohibit the experts from rendering the opinion that "smokeless powder" was used. The district court denied the motion as an issue of the weight of evidence as opposed to its admissibility. Katzenmeier apparently did not object during trial to any expert testimony on this ground. When a party seeks to exclude evidence in a motion in limine, but fails to interpose an objection to the evidence during trial, we review under the plain error standard because the party failed to preserve the alleged error. <u>Nw. Flyers, Inc. v. Olson Bros. Mfg. Co., Inc.</u>, 679 F.2d 1264, 1275 n.27 (8th Cir. 1982).

Katzenmeier has not demonstrated that the district court committed error in allowing defendants' experts William Chapin and Frederick Schmidt to testify. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." <u>Hose v. Chicago Nw. Transp. Co.</u>, 70 F.3d 968, 974 (8th Cir. 1995) (quotations and citations omitted). <u>See</u> <u>also</u> Fed. R. Evid. 703.

The record indicates that Chapin and Schmidt were sufficiently qualified to offer expert opinions. Chapin testified to his background, his education, training and experience; his expectations and observations of the Kodiak; the existence of material in the breech that should not have been present; and the lack of physical evidence that should have been present. Likewise, Schmidt testified to his education; training and experience; his observations of the Kodiak; and his detailed examination of the metallurgical evidence. He also testified that he did not seek to determine what misuse caused an excess in pressure. Chapin's and Schmidt's testimony was not so fundamentally unsupported that it could offer no assistance to the jury. The district court, therefore, did not err in admitting it.

## III.

For the foregoing reasons, the judgment of the district court is affirmed.

_____