# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-2650
_____

West Plains, L.L.C., doing business as CT Freight Company

*Plaintiff - Appellee*

v.

Retzlaff Grain Company Incorporated, doing business as RFG Logistics; Bryce
Wells; Jeffrey Bradley; Thomas Danner; Rebecca Danner; Jody May; Chad
Needham; Todd Payzant; Samantha Rhone; Crystal Konecky; Cindy Scholting;
Drew Waggoner

*Defendants - Appellants*
_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: May 10, 2017
Filed: August 30, 2017
_____

Before RILEY, BEAM, and SHEPHERD, Circuit Judges.
_____

RILEY, Circuit Judge

On February 5, 2013, ten individuals resigned from CT Freight Services, a
division of West Plains, L.L.C. (West Plains), to join a start-up freight brokerage
operation founded by Bryce Wells, the former owner of West Plains. West Plains

sued. The district court[1] granted a temporary restraining order followed by a preliminary injunction against Retzlaff Grain Company (RFG Logistics), prohibiting RFG Logistics from soliciting CT Freight's customers until April 5, 2013. The case proceeded to trial, and a jury found the defendants liable for tortious interference with business relationships and breach of the duty of loyalty. The jury awarded West Plains $1,513,000 and required nine of the ten employees to forfeit portions of compensation received from West Plains. The defendants renewed their motion for judgment as a matter of law and moved for a new trial or amended judgment. The district court denied the motions, and the defendants seek reversal. We affirm. See 28 U.S.C. § 1291 (appellate jurisdiction).

## I.    BACKGROUND
### A.    Factual Background[2]

Bryce Wells was president and shareholder of West Plains Company, an agricultural commodity trading business. In February 2012, Wells sold West Plains Company to West Plains, L.L.C. (West Plains), but declined an offer to stay with West Plains as chief financial officer. West Plains continued to operate the same business units as West Plains Company. One of those business units was a small freight brokerage operation called CT Freight. CT Freight's primary source of revenue was shipping dry commodities, referred to by the parties as the "bulk hopper" industry. The bulk hopper business comprised about 90 percent of CT Freight's annual revenue, and CT Freight's top 20 customers generated roughly 70-75 percent of CT Freight's overall revenue.

---

[1]The Honorable Laurie Smith Camp, Chief Judge, United States District Court for the District of Nebraska.

[2]"In conducting our review, we consider the evidence in the light most favorable to the jury verdict." Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc., 528 F.3d 1001, 1009 (8th Cir. 2008).

At the time of the sale, Thomas Danner and Rebecca Danner (Danners), Jeff Bradley, Chad Needham, Todd Payzant, Samantha Rhone, Crystal Konecky, Cindy Scholting, Drew Waggoner, (the employee defendants) and Jody May[3] were employees of West Plains Company. Needham supervised CT Freight's Omaha office, and Thomas Danner (Danner) supervised another office in Manning, Iowa. The employee defendants all accepted employment with West Plains, and they continued to work in the same positions they held at CT Freight before the sale, with the exception of May. The employee defendants each signed the West Plains Employee Handbook, which prohibited employees from engaging in conflicts of interest and disclosing confidential information to a competitor.

About eight months later, in October 2012, Wells began forming a competing freight brokerage operation, Retzlaff Grain Company, which did business as RFG Logistics. Wells first recruited Scholting, CT Freight's administrative supervisor, Danner and his wife Rebecca, and Needham. Those four individuals signed confidentiality and consulting agreements with Wells in October or November 2012. In exchange for providing Wells information about CT Freight's operations, Wells paid them each a $5,000 consulting fee.

From the time they signed their agreements with Wells to their eventual resignations, Scholting, Needham, and Danner extensively communicated with Wells, closely working with him to organize the details of RFG Logistics. Scholting provided Wells with insight on the dynamics of the CT Freight team and advised him on the best method to recruit the team. Eventually, the supervisors began to recruit the employees. In December, Danner recruited Bradley, a freight broker in the Manning office. In early January 2013, Needham and Wells recruited freight brokers

---

[3]Although May was included in this appeal, the jury found she was not liable on all of the claims brought against her. Therefore, we do not include her in our grouping of the employee defendants.

Waggoner and Payzant and brokerage assistant Rhone. Bradley, Waggoner, and Payzant signed confidentiality and consulting agreements with Wells. By the end of January, the employee defendants had all committed to leaving CT Freight for RFG Logistics. Wells secured an office location in Omaha, and the Danners secured a location in Carroll, Iowa. The plan was in place.

On February 5, 2013, the employee defendants submitted resignations from CT Freight via email. The Danners, Needham, and Payzant announced their resignations were effective immediately. Waggoner, Scholting, and Konecky offered to remain working for CT Freight for approximately one week. Bradley offered to stay until February 8, 2013, and May offered to stay for two weeks. Upon receiving notices of the resignations, West Plains' regional manager summoned Waggoner, May, Rhone, and Konecky to a meeting and directed them to hand over their work cell phones and keys and told them they were free to leave. Scholting was not told to leave. Later that afternoon, Konecky and Waggoner were asked to return to assist customers while West Plains scrambled to find replacements. Scholting, Konecky, and Waggoner remained at CT Freight until February 8, when they declined to sign a two-year non-compete agreement and were told to leave.

### B. Procedural History

On February 8, 2013, West Plains brought this suit alleging claims of (1) misappropriation of trade secrets against all defendants; (2) tortious interference with business relationships against all defendants; (3) tortious interference with employment relationships against Wells and RFG Logistics; (4) breach of the duty of loyalty against the employee defendants; (5) civil conspiracy against all defendants; and (6) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, against Needham. See 28 U.S.C. § 1332(a) (diversity jurisdiction). Four days later, the district court granted a temporary restraining order against the defendants prohibiting them from contacting and providing freight brokerage services for the customers and carriers of CT Freight until further order and ordering the

defendants to return any original documents and records taken from West Plains. On February 26, the district court entered a preliminary injunction extending the terms of the restraining order until April 5, 2013.

In June 2015, the defendants moved for partial summary judgment. The district court concluded Wells (and RFG Logistics) lawfully solicited the employee defendants to join RFG Logistics and granted summary judgment on the claim for tortious interference with employment relationships. The district court also granted summary judgment on the claim against Needham under the Computer Fraud and Abuse Act, but denied summary judgment on the claims for misappropriation of trade secrets and tortious interference with business relationships. In anticipation of trial, the defendants filed a motion in limine to exclude evidence relating to CT Freight's "'total loss of value'" and lost profits after the injunction expired. The district court denied the motion, reasoning claim-specific issues would have to be resolved at trial.

Trial took place before a jury over seven days in January 2016. West Plains called Wells and each of the employee defendants. The district court received into evidence several hundred pages of exhibits, including instant messages and emails exchanged among the defendants and photocopies of the employee defendants' contact lists taken from West Plains. To prove its damages, West Plains called an expert witness who, over the defendants' objection, testified as to the value of the CT Freight division before resignations in February 2013. From reviewing financial statements and customer reports, the expert concluded RFG Logistics was a profitable business in its first month and executed "significant sales that were previously CT Freight's." At the close of the plaintiff's case, the defendants moved for judgment as a matter of law, which the district court denied.

The jury returned a verdict in favor of West Plains on the tortious interference with business relationships claims against all defendants except May, Rhone, and Konecky. The jury also found all employee defendants breached their duty of loyalty

and all defendants except May entered into a civil conspiracy. The jury awarded $1,513,000 in compensatory damages and required forfeiture of compensation against the employee defendants in varying amounts, totaling $51,787.50.[4] The defendants renewed their motion for judgment as a matter of law, or alternatively, to amend the judgment, or for a new trial. The district court denied the motions, and the defendants appeal.

## II.    DISCUSSION
### A.    Judgment as a Matter of Law

Judgment as a matter of law should be granted where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). We review de novo the denial of the defendants' renewed motion for judgment as a matter of law, "viewing the evidence 'in the light most favorable to the party who prevailed before the jury.'" Wilson v. Brinker Int'l, Inc., 382 F.3d 765, 769 (8th Cir. 2004) (quoting City of Omaha Emps. Betterment Ass'n v. City of Omaha, 883 F.2d 650, 651 (8th Cir. 1989)).

### 1.    Tortious Interference with Business Relationships

To prove tortious interference with a business relationship under Nebraska law, West Plains must demonstrate:

"(1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer,

---

[4]The jury determined the following amounts of compensation should be forfeited and awarded to West Plains: $3,333 against Bradley; $15,000 against Thomas Danner; $5,832 against Rebecca Danner; $13,666 against Needham; $2,291.50 against Payzant; $1,666.50 against Rhone; $1,666.50 against Konecky; $6,249 against Scholting; and $2,083 against Waggoner.

(4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted."

Huff v. Swartz, 606 N.W.2d 461, 466 (Neb. 2000) (quoting Koster v. P & P Enters., 539 N.W.2d 274, 278-79 (Neb. 1995)). "In order to be actionable, interference with a business relationship must be both intentional and unjustified." Aon Consulting, Inc. v. Midlands Fin. Benefits, Inc., 748 N.W.2d 626, 645 (Neb. 2008); see also Lamar Co. v. City of Fremont, 771 N.W.2d 894, 906 (Neb. 2009) ("An intentional, but justified, act of interference will not subject the interferer to liability.").

Nebraska has adopted the factors of § 767 of the Restatement (Second) of Torts to determine whether such interference was proper. See Huff, 606 N.W.2d at 468. In this case, the jury was instructed to consider the factors under § 767, which are:

> "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties."

Id. (quoting Restatement (Second) of Torts § 767 (1979)). The factors of § 767 are "to be weighed against each other and balanced in arriving at a judgment; but they do not exhaust the list of possible factors." Recio v. Evers, 771 N.W.2d 121, 132 (Neb. 2009). Upon proving the actions of the interferer were unjust, West Plains was required to show those actions "induce[d] or cause[d] a breach or termination of the [business] relationship[s]." Id. at 131. In their appeal, the defendants raise challenges as to whether their conduct amounted to unjust interference and whether

West Plains proved their conduct proximately caused West Plains' damages after the expiration of the temporary injunction on April 5, 2013.[5]

### a. Acts of Unjust Interference

We begin by evaluating whether there was sufficient evidence to find Wells, and, by extension, RFG Logistics, committed unjust acts of interference. See, e.g., Wiekhorst Bros. Excavating & Equip. Co. v. Ludewig, 529 N.W.2d 33, 40 (Neb. 1995) ("Corporations act through their agents, and the acts of an agent are the acts of the corporation."). Considering the factors of § 767, we think a jury could find Wells unjustly interfered with West Plains' business relationships by knowingly paying, recruiting, and seizing CT Freight's workforce, infrastructure, and customer relationships. Wells knew the competitive freight brokerage industry relies on established relationships among brokers, customers, and carriers. In other words, if Wells could recruit the freight brokers, administrators, and assistants from CT Freight, he could once again own West Plains' small, but profitable, CT Freight division without paying for it, merely eight months after he sold that business to West Plains, L.L.C. Wells paid the Danners, Scholting, and Needham a total of $20,000 in exchange for providing him confidential information about CT Freight and asked seven of the ten individuals to sign confidentiality agreements with him.

Wells ostensibly attempted to avoid some legal consequences by emailing "Transition Rules" to May, Scholting, Danner, and Needham, instructing them to

---

[5]The defendants have not challenged the district court's conclusion that the evidence was sufficient for the jury to find West Plains had a valid business expectancy in continuing its relationships with its current customers. The district court determined, "[a]lthough Nebraska law is not fully developed on this point, it is true that proving a business expectancy 'valid' will generally require proof that there was a reasonable likelihood or probability of a business relationship." Infogroup Inc. v. Database LLC, 95 F. Supp. 3d 1170, 1196 (D. Neb. 2015).

refrain from soliciting CT Freight's customers and not to take anything from CT Freight. West Plains agrees there could have been a scenario in which Wells' recruitment of the employee defendants was legal. See Lamar Co., 771 N.W.2d at 906. But, rather than recruit each employee defendant individually, Wells paid and recruited CT Freight's leaders and put into a place a plan that effectively would remove CT Freight's business to RFG Logistics.

On the topic of customer retention, the defendants' expert testified, "The customers are looking for capacity to move their freight." Due to the group resignation, CT Freight immediately lost its capacity to broker large quantities of freight. The jury could infer Wells understood that by instructing the employee defendants to resign simultaneously and bring their customers to RFG Logistics, he could eliminate CT Freight from competition.

Likewise, there was sufficient evidence to support the jury's findings against the Danners, Bradley, Needham, Payzant, Scholting, and Waggoner. Wells was primarily responsible for setting up RFG Logistics, but the employee defendants took it upon themselves to take CT Freight's customer lists, documents, and confidential information secretly for the immediate benefit of RFG Logistics.[6] During the middle

---

[6]Bradley sent all of his contacts saved on his West Plains cell phone to his personal email address and took his rolodex with customer information with him on the day he resigned. He also downloaded from his computer documents containing customer information on a flash drive for his use at RFG Logistics. Payzant took his personal notebook containing notes of customer rates, preferences, and load information. Payzant emailed Danner and Bradley a spreadsheet he had created containing various rates and quotes that he "thought . . . might be handy as a quick reference guide at a glance." Payzant also sent various rates and attachments relating to one of CT Freight's customers from his work email to his personal email for later use. Needham took a notebook where he had recorded all of his regular entries for Land O'Lakes, "a paper trail for myself," as he described. The Danners both took personal rolodexes containing customer and carrier contacts. Scholting told Wells

of a work day, Waggoner told Payzant over an instant message that he had been sending to his personal email various West Plains documents, including carrier rates, customer information and other things "that wlli [sic] be lost in the transition." Waggoner then suggested the "best way to do it is actually send it to yourself at your work email but then BCC it to your personal." Payzant responded: "good idea." On January 15, around 5 p.m., Waggoner wrote to Payzant, "Chad said if you want anything for the new office from here like notes make sure to start taking out slowly." Payzant asked, "little black books right?" Waggoner replied, "exactly . . . stuff like you just said that you will want . . . just in case they get all pissy when we actually leave." When Payzant responded doing so "would be grounds for legal action," Waggoner replied, "thats [sic] why you get it before they pay attention."

The defendants also made sure their planned departure would not disrupt their business with their existing customers, whom they admittedly planned to bring with them the moment they left CT Freight. In 2012, CT Freight's two largest customers were Land O'Lakes and Nestle. Land O'Lakes brought in over $6,000,000 in revenue that year, and Nestle brought in $2,864,000. Needham managed the relationship with Land O'Lakes, and Danner managed the relationship with Nestle, as well as the third largest customer, Scoular. Both Needham and Danner took steps to ensure that the business was coming with them when they left for RFG Logistics. Danner told Wells in an email:

> The large companies such as Land O Lakes [sic] & Nestle do not react promptly and we don't want to be in limbo for a week or two while they figure it out, identify and give us their blessing to continue our current business under our new name of RFG Logistics. We may want to

---

which software to purchase and assisted him with setting up RFG Logistics' accounting system. Scholting admitted to pulling up Excel files containing CT Freight's 2011 and 2012 load analysis on her RFG Logistics computer.

identify any and all customers that maybe [sic] slow in reacting to a name change and get them squared away long before crunch time.

As Danner affirmed in his testimony, the plan was to get CT Freight's business switched over to RFG Logistics as quickly as possible. As early as January 3, Needham assured Waggoner that Land O'Lakes "will be in place before I leave." Although Land O'Lakes representative Kevin Zimiski stated Needham never solicited business on behalf of RFG Logistics before February 5, 2013, Needham sent a new brokerage agreement to Zimiski on February 1, 2013, days before Needham's resignation from CT Freight. Needham also discussed with Waggoner how to let a frequently used carrier know what was going on "so he is ready," and how to get ready to move another customer's business, ConAgra, "with out [sic] tipping our hand."

While there was nothing unjust about the employee defendants' choice to leave at-will employment with West Plains, there was evidence the employee defendants knew and understood their group resignation would decimate CT Freight. When Waggoner expressed concern about leaving CT Freight for RFG Logistics, writing to Needham in an instant message that the "whole thing" was "honestly a bit scary," Needham plainly stated, "yes but the problem is that *there will be no CT Freight*." (Emphasis added). Payzant expressed a similar sentiment, telling Waggoner via instant message there was "almost like no choice but to drink the punch." Based on the nature and intent of their actions, a jury could reasonably find the employee defendants committed unjust acts of interference.

#### b.    Damages After April 5, 2013

The defendants contend "the evidence fails to support the jury's apparent conclusion the Individual Defendants' resignations proximately caused CT Freight's losses" after the expiration of the two-month injunction on April 5, 2013. The district court rejected this theory, concluding the evidence showed "that the impact of the

Defendants' actions continued after the expiration of the Court's Preliminary Injunction," and that "the damages awarded were the 'probable, direct, and proximate consequences of the wrong complained of.'" (Quoting Bedore v. Ranch Oil Co., 805 N.W.2d 68, 87 (Neb. 2011)).

The defendants find Vigoro Industries, Inc. v. Crisp instructive. See Vigoro Indus., Inc. v. Crisp, 82 F.3d 785, 789 (8th Cir. 1996) (interpreting Arkansas law). Crisp in part considered whether the district court, presiding over a bench trial, had clearly erred by limiting the plaintiff's damages for breach of the duty of loyalty "to the harm caused immediately after [the defendant employee]'s departure by his pre-resignation soliciting." Id. In that case, the plaintiff was a longtime manager of a successful farm supply store. See id. at 787. Several years after Vigoro acquired the store, Crisp decided to open his own store with Cleveland Chemical. See id. Crisp informed Vigoro of his resignation and that his fellow employees, some of whom had critical relationships with customers, would be joining him. See id. at 788. Following the resignations, Vigoro's store began operating at a loss. See id. Vigoro claimed over $2 million in damages for "lost going concern value," $3.5 million in unjust enrichment, and over $4 million in damages for lost profits. Id. at 789. The district court found the evidence of damages did not support "extravagant lost profit theories" and awarded $75,000. Id. Our court determined the award was not clearly erroneous, noting the district court was "left . . . with the difficult task of estimating what damage in fact flowed from Crisp's limited breach of duty" of loyalty. Id. Still, we offered that "we might have been inclined to assign more financial significance to the fact that Crisp took all of Vigoro's work force." Id.

The defendants emphasize no injunction was involved in Crisp, and yet the district court, acting as factfinder, still rejected theories of lost profits. First, we disagree with the defendants' general premise that the injunction would necessarily limit the time period for which damages for their tortious conduct could accrue. The purpose of a preliminary injunction, like the one imposed here, is to mitigate the

-12-

immediate effect of the harm, i.e., preserve the status quo, see <u>Univ. of Texas v. Camenisch</u>, 451 U.S. 390, 395 (1981), and while it is rational to take that into account when determining the extent of the damages, lifting the injunction does not necessarily mean the plaintiff will no longer suffer damages.

Second, unlike in <u>Crisp</u>, we find there was sufficient evidence to show the defendants' conduct proximately caused continuing damages to West Plains. The defendants were not subjected to restrictive covenants, but their concerted action nonetheless resulted in tortious interference that caused significant damage to West Plains. Cf. <u>ABC Trans Nat. Transp., Inc. v. Aeronautics Forwarders, Inc.</u>, 413 N.E.2d 1299, 1313 (Ill. App. Ct. 1980) (noting in a case where the employees resigned en masse to join a competitor, the fact that the defendant employees "might have accomplished legally what they did illegally does not in any way lessen their liability"). In 2012, CT Freight profited over $800,000, but in 2013, CT Freight suffered a net loss of over $150,000. West Plains' chief executive officer Stephen Rhodes testified that after the resignations in February 2013, "[b]asically it was like starting a business from scratch. And so it went very slowly. Revenues dropped dramatically. [CT Freight] started generating losses." To preserve what was left of the business, West Plains immediately began attempting to recruit employees by reaching out to industry groups and headhunters, but as Rhodes stated, "for the most part . . . couldn't find the people for the bulk commodity transportation brokerage business." And although West Plains hired replacements for the employee defendants by May 2013, the replacements did not have experience or an established customer base in the bulk hopper industry. We conclude the evidence was sufficient to show the defendants' actions caused a loss of profits to West Plains, and that the loss continued after the expiration of the temporary injunction.

### 2. Breach of Duty of Loyalty

"Under Nebraska law, it is a generally recognized principle that an employee owes a duty of loyalty to his employer during the course of his

-13-

employment . . . irrespective of the existence of a covenant not to compete or nonsolicitation clause." MeccaTech, Inc. v. Kiser, No. 8:05CV570, 2008 WL 1820800, at *5 (D. Neb. Apr. 21, 2008); see also Cudahy Co. v. Am. Labs., Inc., 313 F. Supp. 1339, 1346 (D. Neb. 1970). To give rise to liability, the employee's disloyal conduct must be "so harmful as to substantially hinder the employer in the continuation of his business." Id. Such conduct might include soliciting customers of the employer or forming one's own competing business while still working for the employer. See Buell, Winter, Mousel & Assocs., Inc. v. Olmsted & Perry Consulting Eng'rs, Inc., 420 N.W.2d 280, 283 (Neb. 1988).

The jury found all the employee defendants breached their duty of loyalty. The defendants insist the unjustified conduct providing the basis for the tortious interference claim cannot serve as the basis for a duty of loyalty breach claim. Yet absent any Nebraska legal authority, we fail to see why the same conduct could not provide the basis for both claims. Cf. Synergetics, Inc. v. Hurst, 477 F.3d 949, 959 (8th Cir. 2007); Kant v. Altayar, 704 N.W.2d 537, 540 (Neb. 2005) ("The same wrongful conduct may support a civil action based on a theory of battery as well as an action based upon the independent tort of intentional infliction of emotional distress.").

We conclude there was sufficient evidence for a reasonable jury to find the employee defendants breached their duty of loyalty. While employed by West Plains, the defendants intended to hinder CT Freight's business substantially by offering insider information to RFG Logistics, and then resigning as a group to ensure the customers followed. As an affirmation of the duties owed to their employer West Plains, each of the employee defendants signed an employment agreement promising to avoid personal conflicts of interests and improper distribution of company information. Despite that promise, the employee defendants acted in concert to provide Wells and RFG Logistics important information while they were still employed by West Plains. Seven of the employee defendants signed confidentiality

-14-

and consulting agreements with Wells in violation of their West Plains' employment agreements, and four of those defendants were actually paid for that work while still working for West Plains.[7]

The defendants argue that even if the breach of loyalty claims were upheld, the forfeiture awards against the employee defendants were excessive. "'An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty.'" Neece v. Severa, 560 N.W.2d 868, 873 (Neb. Ct. App. 1997) (quoting Restatement (Second) of Agency § 469 (1958)). The jury was instructed that if it found the employee defendants liable for breach of the duty of loyalty, it could consider "whether Plaintiff is entitled to recover the compensation it paid to those Defendants who breached their duty of loyalty during any periods of disloyalty while employed with Plaintiff." Here, the jury required supervisors Needham and Danner and also Rebecca Danner to pay a total of two months' salary. The jury required Scholting to pay one-and-a-half months' salary, and Rhone, Payzant, Waggoner, and Konecky each to pay less than one month's salary. The defendants contend requiring the employee defendants "to forfeit several months of compensation, even during periods of loyal conduct, resulted in a windfall recovery to West Plains." See Design Strategies, Inc. v. Davis, 384 F. Supp. 2d 649, 667 (S.D.N.Y. 2005) (approving forfeiture of compensation only during periods of disloyal conduct, broken down by pay periods). We disagree. Given the extent to which each employee defendant was involved in the planning of RFG Logistics and the time in which they were so committed, there was adequate support for each award.

---

[7]In addition to the conduct discussed in the previous section, the jury heard that Rhone and Konecky actively assisted RFG Logistics while they were still employed by West Plains. Rhone emailed herself a spreadsheet she developed at West Plains and a list of dedicated Omaha trucks. Brokerage assistant Konecky provided customer load information to Needham via instant message on February 5, 2013, after Needham had resigned and was working at RFG Logistics and while Konecky was still with CT Freight.

-15-

### 3. Civil Conspiracy

"'A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means.'" Dixon v. Reconciliation, Inc., 291 N.W.2d 230, 232 (Neb. 1980) (quoting Peters v. Woodman Accident & Life Co., 104 N.W.2d 490, 496 (Neb. 1960)). Liability for a civil conspiracy is predicated on the existence of an underlying claim. See Koster, 539 N.W.2d at 278. "[B]y establishing a civil conspiracy, a plaintiff extends liability for the wrongful acts underlying the conspiracy to those actors who did not actively engage in the acts, but conspired in their commission." United Gen. Title Ins. Co. v. Malone, 858 N.W.2d 196, 215 (Neb. 2015). The jury was instructed that West Plains was required to prove the defendants committed "one or more of the following unlawful acts against [West Plains]: . . . unjustified interference with [West Plains'] business relationships . . . or breach of duty of loyalty to [West Plains]." Because the instruction did not require the jury to distinguish between which underlying claims provided the basis for the conspiracy claim, a finding of liability on either would support the conspiracy claim. West Plains then was required "to prove the existence of at least an implied agreement to establish conspiracy." deNourie & Yost Homes, LLC v. Frost, 854 N.W.2d 298, 316 (Neb. 2014). There was abundant evidence showing the defendants entered into an agreement tortiously to interfere with West Plains' business or to breach their duty of loyalty.

**B.    Motion for a New Trial or Altered or Amended Judgment**[8]

A district court may grant a new trial "for any reason for which a new trial has . . . been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). "A motion for new trial is addressed to the judicial discretion of the trial judge and will not be reversed except for a clear abuse of that discretion." Altrichter v. Shell Oil Co., 263 F.2d 377, 380 (8th Cir. 1959). The defendants assert they are entitled to a new trial because (1) West Plains was improperly allowed to present evidence relating to "total loss of business value" damages; (2) West Plains' expert witness was allowed to give an opinion as to the total loss of CT Freight; (3) the jury was improperly instructed on damages; (4) the correct measure of damages is the difference between the value of the business immediately before and after the alleged misconduct; (5) the damages award was excessive and contrary to the evidence; (6) the defendants' proposed instruction on the effect of the district court's temporary injunction should have been adopted; and (7) West Plains failed to present sufficient evidence of mitigation of damages. We address each argument in turn.

### 1.    Total Loss of Business Value Damages

Before trial, the defendants filed a motion in limine seeking to exclude evidence of total loss of value damages, which the district court denied. The district court noted neither party had provided Nebraska authority on the issue, and then determined Nebraska law would not require a plaintiff "to show *complete* destruction as a [prerequisite] to recovery on a lost value theory." The defendants argue the district court erred by permitting the jury to consider evidence of total loss of business value damages—or, in other words, the market value of a business at the time of the

[8]The defendants do not assert any independent grounds for reversal under Fed. R. Civ. P. 59(e). See Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills, 141 F.3d 1284, 1286 (8th Cir. 1998) (explaining motions to alter or amend a judgment "serve a limited function of correcting 'manifest errors of law or fact or to present newly discovered evidence'" (quoting Hagerman v. Yukon Energy Corp., 839 F.2d 407, 414 (8th Cir. 1988))).

tortious interference—because CT Freight's business was not completely destroyed. See KMS Restaurant Corp. v. Wendy's Int'l Inc., 194 F. App'x 591, 601 (11th Cir. 2006) ("'[I]f a business is completely destroyed, the proper total measure of damages is the market value of the business on the date of the loss. If the business is not completely destroyed, then it may recover lost profits. A business may not recover both lost profits and the market value of the business.'" (quoting Montage Grp. Ltd. v. Athle-Tech Comput. Sys., Inc., 889 So. 2d 180, 193 (Fla. Dist. Ct. App. 2004))). The defendants do agree Nebraska law provides for recovery of lost profits damages for tortious interference of business relationships. See Triple R Indus., Inc. v. Century Lubricating Oils, Inc., 912 F.2d 234, 237-38 (8th Cir. 1990) ("Under Nebraska law, 'prospective profits from an established business, prevented or interrupted by the tortious conduct of the defendant, are recoverable when it is proved (1) that it is reasonably certain such profits would have been realized except for the tort, and (2) that the lost profits can be ascertained and measured, from evidence introduced, with reasonable certainty.'" (quoting K & R, Inc. v. Crete Storage Corp., 231 N.W.2d 110, 114 (Neb. 1975))); see also ACI Worldwide Corp. v. Baldwin Hackett & Meeks, Inc., 896 N.W.2d 156, 181, 195-96 (Neb. 2017) (holding the jury's award of $43,806,362.70 for future lost profits was supported by sufficient evidence). As long as there is "sufficient evidence" to show "a loss of profits was suffered, it is proper to let the jury determine what the loss probably was from the best evidence the nature of the case allows." Gary's Implement, Inc. v. Bridgeport Tractor Parts, Inc., 799 N.W.2d 249, 259 (Neb. 2011).

### 2.    West Plains' Expert Testimony

The defendants contend the district court erred by allowing West Plains' expert, William Kenedy, to offer an opinion on the value of CT Freight at the time of the resignations. "Only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Katzenmeier v. Blackpowder Prod., Inc., 628 F.3d 948, 952 (8th Cir. 2010) (quoting Hose v. Chicago Nw. Transp. Co., 70 F.3d 968, 974 (8th Cir.1995)).

First, Kenedy conducted an analysis comparing the revenue logged from CT Freight's top 20 customers in 2012 and 2013, and compared those figures to RFG Logistic's revenue from its top customers in 2013. Kenedy explained: "March of 2013 and April of 2013 is when CT Freight's revenue from these top 20 customers effectively, for the most part, disappears. And then suddenly in April of 2013, RFG, which previously hadn't had much sales, has sales from these same customers." Kenedy continued, based on the month-by-month financial statements for CT Freight in 2013, after the employees' resignation, "that effectively the business of CT Freight at that point in time was . . . effectively a total loss. The entire company—the value of the company was gone based on that transaction." From reviewing RFG Logistics' corresponding "financial statements and . . . monthly sales-by-customer reports," Kenedy testified that after February 2013, RFG Logistics "was a profitable business and it had significant sales that were previously CT Freight's."

Second, Kenedy offered his opinion as to the value of CT Freight in February 2013. According to Kenedy, before February 5, 2013, the value of CT Freight was $2,131,000, based upon "the value of future profits." Kenedy also stated between February and October 13, 2013, CT Freight suffered $330,000 in actual losses as it tried "to mitigate the damage and rebuild the business." To formulate his opinion, he compared CT Freight's financial results and customer mix from the years 2011, 2012, 2013, and 2014. Kenedy also considered overhead, expenses, salaries, as well as discussions with management, revenue by customer, industry trends, and expected growth rates. Based on his review of that information, he concluded CT Freight was "unable to make a profit going forward from the date of this incident all the way through 2014. So . . . that is important to me to say that it was a total loss." Given the foundation provided in Kenedy's analysis, we conclude the district court committed no error in allowing West Plains to offer Kenedy's opinions. See, e.g., Wash Sols., Inc. v. PDQ Mfg., Inc., 395 F.3d 888, 893 (8th Cir. 2005) ("For established businesses, expected future profits may be extrapolated with reasonable

-19-

certainty from historical evidence of the income and expenses of the business prior to the damaging event.").

### 3. Jury Instructions

The defendants contend the district court failed to instruct properly the jury on the issue of damages. "Appellate review of a district court's jury instructions 'is limited to whether the instructions, viewed on the whole, fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury in a particular case.'" Ross v. Garner Printing Co., 285 F.3d 1106, 1111 (8th Cir. 2002) (quoting Omega Healthcare Inv'rs, Inc. v. Lantis Enters., Inc., 256 F.3d 774, 776 (8th Cir. 2001)).

After the parties had concluded making their formal objections in regard to the jury instructions and verdict form, the district court asked whether "there [was] anything else we need to talk about before the jury comes in?" The defendants answered yes, and asked for an instruction to "tell the parties that it cannot refer [in closing argument] to lost asset of the business." Overruling the objection, the district court responded by first noting it had previously addressed the damages issue when denying the defendants' motion in limine, and further explained the jury instructions on damages had been "left fairly open intentionally." The district court stated: "When we were in chambers in the informal jury instruction conference, there was no discussion about this. There were no arguments about the instructions as they related to damages. And it will be up to the jury to decide what will fairly and reasonably compensate [the] plaintiff for its injury if they find liability in this case." Our review of this exchange leads us to conclude the defendants did not formally object to the jury instructions they challenge here and thus failed properly to raise the issue. See Fed. R. Civ. P. 51(b)(2), (c)(2). Because the defendants failed formally to object, "we review for plain error only." Greaser v. State of Mo., Dep't of Corr., 145 F.3d 979, 984 (8th Cir. 1998). "[W]e may grant plain error relief when instructional error is plain, affects a party's substantial rights, and 'seriously affect[ed] the fairness,

integrity, or public reputation of judicial proceedings.'" Moore v. Am. Family Mut. Ins. Co., 576 F.3d 781, 786 (8th Cir. 2009) (second alteration in original) (quoting Cedar Hill Hardware & Const. Supply, Inc. v. Ins. Corp. of Hannover, 563 F.3d 329, 351 (8th Cir. 2009)).

The defendants challenge two instructions. The first, No. 21, stated in relevant part:

> If you return a verdict for [West Plains] on any of its claims, then you must decide how much money will reasonably and fairly compensate [West Plains] for its injury. Remember, throughout your deliberations you must not engage in any speculation, guess, or conjecture and you must not award any damages by way of punishment or through sympathy. Although [West Plains] seeks recovery of damages on four theories, you many assess only one recovery. If you find for [West Plains] on one or more of the theories, any verdict for [West Plains] must be in a single amount and there can be no duplication of [the] damage.

The second, No. 22, further instructed that if the jury found liability, West Plains would be "entitled to the reasonable value of the profits [West Plains] has lost and is reasonably certain to lose in the future as a result of [the] Defendant[s'] unlawful conduct." The instruction explained the burden was on West Plains to prove "it is reasonably certain such profits would have been realized except for the Defendants' unlawful conduct," and "the lost profits can be ascertained and measured, from evidence introduced, with reasonable certainty."

The defendants claim these instructions forced jurors to make an "'all or nothing decision,'" leading to a windfall recovery for West Plains. We disagree. While the instructions, as the district court admitted, are certainly broad, the district court adequately instructed the jury on Nebraska law, and told the jury it could not

base its award on speculation. We conclude any error was not so plain as to warrant a new trial.

### 4. Damages Award

The defendants next challenge the jury's general compensatory damages award of $1,513,000, arguing the amount is excessive and contrary to the weight of the evidence.[9] "When presented with a question as to whether a state law claim damage award is excessive, state substantive law guides our review." Hurst, 477 F.3d at 960. Under Nebraska law, "[i]n order for an award to be so excessive as to warrant a new trial, it must be so clearly against the weight and reasonableness of the evidence and so disproportionate as to indicate that it was the result of passion, prejudice, mistake, or some means not apparent in the record, or that the jury disregarded the evidence or rules of law." Shipler v. Gen. Motors Corp., 710 N.W.2d 807, 840 (Neb. 2006). In Hurst, we upheld the jury's award of $1,759,165 in damages for tortious interference and breach of loyalty claims. See Hurst, 477 F.3d at 960. We reasoned it was "obvious that the jury believed and relied upon" the plaintiff's expert witness, who calculated the amount of economic damages suffered by the plaintiff based on the plaintiff's "lost profits from sales, price erosion, and out-of-pocket expenses." Id.

Here, the jury's award of $1,513,000 in compensatory damages is considerably less than what Kenedy testified was the total value of the business before the resignations and reflects an amount a reasonable jury could have believed would fairly compensate West Plains for damages it sustained as a result of the defendants' tortious conduct. See W. Fireproofing Co. v. W.R. Grace & Co., 896 F.2d 286, 292 (8th Cir. 1990) (finding "no basis in the record" to disregard the jury's award of market value damages caused by tortious interference of defendant (interpreting

---

[9]The verdict form simply asked, "If you found in favor of [West Plains] on any of the claims . . . what is the total amount of damages, if any, that will reasonably and fairly compensate [West Plains] for its injury caused by . . . the Defendants' unlawful conduct based on the instructions provided in Instruction No. 21?"

Missouri law)).  In 2012, CT Freight made a total of over $19 million in sales revenue, averaging between $1.4 and $1.8 million in sales revenue per month, and realizing an $831,488.27 profit for the year.  In comparison, the monthly sales revenue drastically dropped after February 2013, resulting in only $7.5 million total annual sales and a $137,364.85 loss for the CT Freight division that year.  Based on the evidence West Plains produced at trial, we are satisfied the jury's award was not based on improper reasoning. See Roth v. Wiese, 716 N.W.2d 419, 436 (Neb. 2006) ("The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved.").

### 5.  Proposed Jury Instruction

We also reject the defendants' argument that the district court should have included their proposed jury instruction relating to the effect of the temporary injunction that was lifted on April 5, 2013.  "A party 'is not entitled to a particularly worded instruction.'"  Retz v. Seaton, 741 F.3d 913, 919 (8th Cir. 2014) (quoting United States v. Meads, 479 F.3d 598, 601 (8th Cir. 2007)).  "'Our review is limited to a determination of whether the instructions fairly and accurately present the evidence and law to the jury given the issues in the case.'"  Id. (quoting Eden Elec., Ltd. v. Amana Co., 370 F.3d 824, 827 (8th Cir. 2004)).  The proposed instruction, No. 35, stated:

> From February 12, 2013 until April 5, 2013, Defendants were enjoined, or prohibited, by this Court from competing for the same customers and carriers serviced by [West Plains].  After April 5, 2013, Defendants were allowed to lawfully compete for the same customers and carriers serviced by [West Plains].  If you are considering awarding [West Plains] any lost profit damages, Defendants are not liable for any lost profit damages after April 5, 2013.

For the same reasons previously discussed, the district court was not required to limit further the time period under which the jury could find West Plains sustained harm.

### 6. Mitigation Evidence

Finally, the defendants claim West Plains failed to present sufficient evidence showing it attempted to mitigate its damages after the employee defendants' resignations. "'A plaintiff's failure to take reasonable steps to mitigate damages bars recovery, not in toto, but only for the damages which might have been avoided by reasonable efforts.'" Tedd Bish Farm, Inc. v. Sw. Fencing Servs., LLC, 867 N.W.2d 265, 271 (Neb. 2015) (quoting Borley Storage & Transfer Co. v. Whitted, 710 N.W.2d 71, 80 (Neb. 2006)). West Plains took steps to mitigate damages by immediately transferring employees from another division to CT Freight, despite their lack of experience in the bulk hopper industry. West Plains contacted its customers taken by the defendants in an effort to retain their business. The new management hired at CT Freight expanded the business into other sectors of the freight brokerage industry, like dry van and refrigerated goods. Considering the competitive, relationship-based nature of the industry, it was reasonable CT Freight would try to expand into new sectors, in addition to rebuilding its customer base in the bulk hopper industry.

## III. CONCLUSION

We affirm in all respects.

_____