# United States Court of Appeals
## For the Eighth Circuit

_____

Nos. 19-2554, 19-3662, 20-1438

_____

Jo Ann Howard and Associates, P.C., Special Deputy Receiver of Lincoln
Memorial Life Insurance Company, Memorial Service Life Insurance Company,
and National Prearranged Services, Inc.; National Organization of Life and Health
Insurance Guaranty Associations; Missouri Life and Health Insurance Guaranty
Association; Texas Life and Health Insurance Guaranty Association, formerly
known as Texas Life, Accident, Health and Hospital Service Insurance Guaranty
Association; Illinois Life and Health Insurance Guaranty Association; Kansas Life
and Health Insurance Guaranty Association; Oklahoma Life and Health Insurance
Guaranty Association; Kentucky Life and Health Insurance Guaranty Association;
Arkansas Life and Health Insurance Guaranty Association,

*Plaintiffs - Appellees*,

v.

National City Bank,

*Defendant - Appellant*,

PNC Bank, N.A.,

*Defendant - Appellant*,

_____

Appeals from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 12, 2021
Filed: August 30, 2021
_____

Before COLLOTON, WOLLMAN, and SHEPHERD, Circuit Judges.
_____

COLLOTON, Circuit Judge.

PNC Bank and National City Bank appeal an award of damages after a bench trial that resulted in a judgment in favor of the appellees, Jo Ann Howard and Associates, P.C., and a group of state guaranty associations. The district court[1] ruled that Allegiant Bank breached its fiduciary duties in administering seven trusts, and that PNC was liable for the breach as the successor-in-interest to National City Bank, which in turn had acquired Allegiant. On appeal, the appellants, to whom we will refer as PNC, contest four aspects of the damages award. PNC argues that the district court: (1) improperly calculated compensatory damages, (2) erred in awarding prejudgment interest, (3) improperly awarded punitive damages, and (4) exceeded its authority by awarding attorney's fees and declining to reduce the award. We conclude that none of PNC's arguments establishes reversible error, and therefore affirm the judgment.

I.

This case arises out of the nationwide fraud scheme of National Prearranged Services, Inc. (NPS), a Missouri-based seller of pre-need funeral contracts. The Cassity family owned and operated NPS. The Cassitys also owned two Texas-based

_____

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

life insurance companies, Lincoln Memorial Life Insurance and Memorial Service Life Insurance Company.

Chapter 436 of the Missouri Revised Statutes, now repealed, governed the making of pre-need funeral contracts in Missouri during the relevant period. Mo. Rev. Stat. §§ 436.005-.071 (2008) (repealed 2009). A pre-need contract was an arrangement that required the current payment of money in consideration for funeral services to be provided later at the time of a death. *Id.* § 436.005(5). NPS sold pre-need funeral contracts that allowed consumers to purchase funeral services at a fixed price. When the pre-need contract's beneficiary died, the purchaser's chosen funeral home performed the funeral according to the contract. After the funeral, the funeral home submitted a written certification to NPS establishing that it provided the funeral services to the deceased beneficiary. *Id.* § 436.045. Upon receipt of the certification, NPS paid the funeral home the amount specified in the pre-need contract plus a "growth" payment.

When a consumer purchased a pre-need funeral contract, NPS could retain up to twenty percent of the proceeds of the contract, *id.* § 436.027, and was required to deposit the other eighty percent into a trust. *Id.* §§ 436.021.1(2), 436.027, 436.031.1. Once NPS paid the funeral home, NPS was entitled to a distribution from the trust equal to all deposits made into the trust for the particular pre-need contract. *Id.* § 436.045. Missouri law required NPS to appoint a state or federally chartered financial institution as trustee of its trusts. *Id.* § 436.031.1.

Allegiant Bank served as the trustee for seven of NPS's Missouri trusts. Allegiant served as trustee until May 2004, when it resigned after being acquired by National City Bank. Because National City Bank did not want to assume Allegiant's role as trustee, Allegiant transferred the trust assets to Bremen Bank, which became the trustee.

Allegiant's responsibilities as trustee were set forth in the NPS trust agreement, which was governed by Chapter 436. During Allegiant's tenure as trustee, Herbert Morisse served as Allegiant's trust administrator for the NPS trusts. Morisse's responsibilities included complying with the trust agreement and Chapter 436. Because the NPS trusts held funds in excess of $250,000, NPS was allowed to appoint an independent qualified investment advisor to make investment decisions for the trust property. Mo. Rev. Stat. § 436.031.2 (repealed). When Allegiant assumed its role as trustee, NPS already had appointed Wulf Bates & Murphy (Wulf) as its investment advisor. Wulf served throughout Allegiant's tenure as trustee. During this time, Wulf used trust assets to purchase Lincoln life insurance policies. The policies insured the lives of NPS's pre-need consumers in Missouri. When a consumer died, Lincoln paid the proceeds of the policies to the NPS trusts.

In 2007, insurance regulators discovered that NPS had engaged in massive fraud for years. At the direction of NPS, Lincoln routinely issued policy loans to NPS against Lincoln life insurance policies owned by the Missouri trusts without the trustee's written approval. NPS caused the loans to issue even though the trustee was the only party permitted to take such a loan. This practice depleted trust assets. Separately, and outside of Missouri, NPS manipulated the payment amounts reflected on life insurance policy applications, allowing it to retain most of the money that should have been sent to the issuing life insurance company. For example, if a consumer paid fifteen hundred dollars for an insurance policy, NPS would change the amount paid to five dollars, send five dollars to Lincoln, and keep the rest of the money.

As a result of this fraud, a Texas receivership court placed NPS, Lincoln, and Memorial into receivership, and the court appointed a special deputy receiver. After the three entities were placed into receivership, the receiver and the state guaranty associations agreed to a liquidation plan for the entities. Under the plan, the associations agreed that any death benefits that would otherwise be due or payable

to NPS or its trusts under the policies would be paid to funeral homes. The funeral homes and consumers, in turn, agreed to assign to the associations any rights under, and causes of action relating to, the policies.

In August 2009, the appellees commenced this action. They sued on behalf of NPS, funeral homes, and consumers. The complaint alleged that Allegiant, PNC's predecessor, breached its fiduciary duties as trustee, acted negligently, and aided and abetted fraud and breach of fiduciary duty. Appellees asserted that Allegiant breached its fiduciary duties and acted negligently when it allowed NPS to take policy loans on the trust-owned insurance policies, failed to ensure that the loans were adequately secured, neglected to account adequately for the funds in the NPS pre-need trusts, failed to keep and review adequate records of trust transactions, and failed to verify trust account records. The complaint alleged that as a result of these breaches of duty and negligent acts, Allegiant allowed NPS agents to manipulate trust assets and siphon millions of dollars from the NPS trusts. In separate aiding-and-abetting claims, the complaint alleged that Allegiant knew of independent breaches of fiduciary duty by Wulf and acts of fraud by NPS, and substantially assisted or encouraged them.

In 2015, a jury awarded appellees $355.5 million in compensatory damages and $35.55 million in punitive damages. PNC appealed the judgment, and we concluded that the plaintiffs' claims arose under trust law rather than tort law and should have been tried to the court. *Jo Ann Howard & Assocs., P.C. v. Cassity*, 868 F.3d 637, 645-49 (8th Cir. 2017). We also determined that the appropriate measure of damages is set forth in Restatement (Second) of Trusts § 205. *Id.* at 646.

On remand, the district court held a bench trial and issued a comprehensive opinion. The court concluded that Allegiant breached fiduciary duties that it owed the beneficiaries, and that PNC's defenses failed to relieve Allegiant of liability. The district court awarded damages for losses to the trusts under Restatement (Second)

of Trusts § 205(a), but declined to award damages for profits made from the breach under § 205(b). The award totaled $100 million, and included compensatory damages, punitive damages, and prejudgment interest. After entry of the judgment, the district court awarded attorney's fees to appellees, and recalculated the prejudgment interest award.

## II.

PNC challenges three aspects of the compensatory damage award. We review the amount of damages for clear error as a finding of fact, and we consider questions of law *de novo*. *Lockhart v. United States*, 834 F.3d 952, 955 (8th Cir. 2016).

PNC first contends that the district court erred by considering only the three trusts that incurred losses during Allegiant's tenure. PNC complains that the court did not offset those losses with gains enjoyed by the other four NPS trusts during the relevant period. Echoing the position of their actuarial expert, PNC asserts that it is liable only for the "net loss" attributable to the trusts, because Allegiant committed a single breach of trust that impacted all seven trusts.

The Restatement (Second) of Trusts § 213 provides that, when calculating trust damages resulting from a breach, "[a] trustee who is liable for a loss occasioned by one breach of trust cannot reduce the amount of his liability by deducting the amount of a gain which has accrued through another and distinct breach of trust." The Restatement further says that "if the two breaches of trust are not distinct, the trustee is accountable only for the net gain or chargeable only with the net loss resulting therefrom."

The district court determined that "each of the seven NPS pre-need trusts were separate trusts, with separate beneficiaries." As such, the court concluded that "[g]ains in one should not be used to offset losses in another." PNC argues that

-6-

because the district court found a "systematic" breach of trust by Allegiant, and the offending conduct was uniform across the trusts, the breaches of trust were not distinct. But whether breaches of trust are distinct depends on a multi-factor analysis in which "[n]o positive rules can be laid down in respect to the relative weight to be given to these different factors." Restatement (Second) of Trusts § 213 cmt. e (Am. L. Inst. 1959). Two factors are prominent here. "Where the breaches of trust relate to different parts of the trust property, they are more likely to be distinct than where they arise out of successive dealings with the same property or its product." *Id.* And "[w]here the trustee engages in successive dealings with the trust property or its product intending to misappropriate it, the successive dealings are more likely to be considered distinct than if he did not intend to misappropriate it." *Id.* Those factors weigh strongly in favor of the district court's conclusion, and we see no error in declining to apply offsets.

Second, PNC complains that the district court erred in calculating damages by considering losses from loans that NPS took out against the Lincoln insurance policies. Under the Restatement, a trustee "is chargeable with . . . any loss or depreciation in value of the trust estate resulting from the breach of trust." Restatement (Second) of Trusts § 205(a). But the trustee is not accountable for a "loss or depreciation . . . not resulting from a breach of trust." *Id.* § 204. Equity courts, therefore, must consider whether there is a "causal connection between the breach of trust and the loss." *Id.* § 205 cmt. f; *see also Brown v. Brown*, 530 S.W.3d 35, 41 (Mo. Ct. App. 2017).

PNC asserts that Allegiant's breach of trust did not proximately cause the losses experienced by the trusts as a result of the policy loans. On the bank's view, the losses did not "result from" the breach. PNC posits that Allegiant was unaware that NPS and Lincoln were taking out loans against the policies, never authorized the loan transactions, and had no reason to know about the policy loans.

There is sufficient evidence, however, to support the district court's finding that Allegiant knew about the policy loans. Two wire transfer forms in Allegiant's files have a "POL LOAN" notation; the phrase "policy loans" is handwritten on another wire form. This evidence tends to show that Allegiant knew that the policy loans existed. PNC complains that these "vague notations" on three "documents (out of thousands) are insufficient." But an expert on trusts testified that "a reasonably prudent trustee" seeing any one of those forms would have inquired into why money was moving into the trusts, and thereby would have discovered the existence of the loans.

Even if Allegiant did not know about the policy loans, the district court found that Allegiant *should* have known, and this finding is supported by the record. Missouri law required trustees of pre-need trusts to "maintain adequate books of account of all transactions administered through the trust." Mo. Rev. Stat. § 436.031.5 (repealed). Allegiant thus should have maintained records showing the origin of money deposited into the trusts. Allegiant instead agreed to relinquish control over the Lincoln policies and to exercise no oversight of them. Allegiant transferred custody of the policies to NPS, and agreed to distribute "any . . . assets" from the trust accounts however NPS and Wulf directed. This arrangement allowed NPS to take control of the policy loans without Allegiant's approval. Allegiant's trust department never reviewed the incoming deposits, and Morisse of Allegiant testified that he was not even aware of the policy loans. The district court did not err in concluding that Allegiant's breach of trust caused the losses from the policy loans.

Third, PNC contends that the district court erred by relying on a damages calculation from PNC's expert, Terry Long, that assumed "growth" benefits in the Lincoln insurance policies that increased the value of the policies each year. Long submitted two alternative calculations: one assumed a growth benefit for *both* the insurance policies and the pre-need funeral contracts ($72,287,615); the other assumed that *neither* included a growth benefit ($70,902,882). Two other experts

submitted loss calculations: one estimated $74,227,215, and the other suggested approximately $77.1 million. The district court noted that the calculations were "remarkably close to each other," and found that the loss amount was $72,287,615.

PNC maintains that because the district court's finding matched Long's calculation that assumed growth benefits, the award is inconsistent with the court's finding elsewhere that the insurance policies did not provide a growth benefit. PNC argues that the court should have adopted Long's lower calculation of $70,902,882 that assumed no growth benefits. But the district court did find that the pre-need funeral contracts (but not the insurance policies) included a growth benefit. So neither of Long's set of assumptions matched the district court's underlying assumptions about growth benefits, and the court was justified in rejecting Long's lower alternative.

In making an ultimate finding, the court was not required to adopt any expert's calculation in its entirety. There was competing testimony that Long's calculations understated the loss, and that a growth benefit in the pre-need contracts alone would have resulted in a total loss that exceeded Long's calculation of $72,287,615. The district court evidently found that Long underestimated the loss to some extent, but not as much as the plaintiffs argued, and settled on a figure between the two positions. This finding of fact, based on a weighing of multiple expert opinions in light of a voluminous evidentiary record, was not clearly erroneous. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574-75 (1985).

III.

PNC next argues that the district court should not have awarded prejudgment interest because appellees' damages were not readily ascertainable. In an action at law in Missouri, prejudgment interest at a rate of nine percent is required when "the amount due is liquidated or 'readily ascertainable by reference to recognized

standards.'" *Am. Eagle Waste Indus., LLC v. St. Louis County*, 379 S.W.3d 813, 835 (Mo. 2012) (quoting *St. John's Bank & Tr. Co. v. Intag, Inc.*, 938 S.W.2d 627, 630 (Mo. Ct. App. 1997)); *see* Mo. Rev. Stat. § 408.020. Courts require ready ascertainability in actions at law, because "where the person liable does not know the amount he owes he should not be considered in default because of failure to pay." *Fohn v. Title Ins. Corp. of St. Louis*, 529 S.W.2d 1, 5 (Mo. 1975).

We are not convinced that the same requirement applies in an equitable action under Missouri law. The Missouri Supreme Court has not addressed the issue, and the intermediate appellate courts suggest that an award of prejudgment interest in equity is discretionary. *Health Care Found. of Greater Kan. City v. HM Acquisition, LLC*, 507 S.W.3d 646, 668-69 (Mo. Ct. App. 2017) ("In equitable actions, the determination of whether to award prejudgment interest is left to the discretion of the trial court.") (quoting *McDonald v. Ins. Co. of State of Pa.*, 460 S.W.3d 58, 67 (Mo. App. 2015); *Taylor-McDonald v. Taylor*, 245 S.W.3d 867, 878-79 (Mo. Ct. App. 2008) (per curiam) ("The trial court's decision to award prejudgment interest in this case was completely discretionary.").

Generally speaking, an award of interest in equitable actions is "a matter for the chancellor's discretion." *Boyle v. Crimm*, 253 S.W.2d 149, 157 (Mo. 1952). Historically, there was a distinction between the award of interest in cases at law and in equity. Because fiduciary cases "were decided in equity courts, the generalization often made was that interest would be permitted in equity, as a matter of the chancellor's discretion, even where not permitted at law because the claim was unliquidated." Dan B. Dobbs & Caprice L. Roberts, Law of Remedies § 3.6(2), at 256 (3d ed. 2018); *see* Restatement (Third) of Restitution and Unjust Enrichment § 53 cmt. e (Am. L. Inst. 2011). Although the lack of a readily ascertainable amount could be a factor in equity that supports a decision to forgo an award prejudgment interest, *see Robinson v. Langenbach*, 599 S.W.3d 167, 187-88 (Mo. 2020), our best

-10-

prediction of Missouri law is that there is no such hard-and-fast prerequisite for prejudgment interest in equity.

Even assuming for the sake of analysis that Missouri law does require damages to be readily ascertainable to award prejudgment interest, we still find no basis for reversal. PNC's own actuarial expert, Long, admitted that appellees' damages have been readily ascertainable since 2004 when Allegiant's tenure as trustee ended. Long said that in 2004, he could have used the same actuarial method to calculate the same amount of damages that he presented to the court. That the final amount of damages was disputed at trial does not dictate a conclusion that the damages were not readily ascertainable. *See Unlimited Equip. Lines, Inc. v. Graphic Arts Ctr., Inc.*, 889 S.W.2d 926, 942-43 (Mo. Ct. App. 1994).

PNC also contests the district court's action, on its own motion after judgment was entered, to modify the ending date for the calculation of prejudgment interest. The court adjusted the ending date from the date when trial commenced to the date of the judgment. As authority for this change, the court cited Federal Rule of Civil Procedure 60(a), which provides that a district court "may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment . . . on its own, with or without notice." PNC maintains that there was no "clerical mistake," "oversight," or "omission" that justified the adjustment.

Assuming that Rule 60(a) was not the proper source of authority for this action, we conclude that any error was harmless because the district court acted within the discretion afforded by Rule 60(b). That rule provides that "[o]n motion and just terms, the court may relieve a party . . . from a final judgment" for one of six enumerated reasons, including "mistake." Fed. R. Civ. P. 60(b)(1). This court has ruled that the "motion" requirement may be satisfied by the court's own motion—that is, "a district court can grant relief from a judgment pursuant to Rule 60(b) *sua sponte*." *Pierson v. Dormire*, 484 F.3d 486, 491 (8th Cir. 2007). The district court

initially used a mistaken ending date for prejudgment interest, and such a mistake is correctable within "a year after the entry of the judgment." Fed. R. Civ. P. 60(c)(1). The district court acted timely to remedy a mistaken calculation, and there was no abuse of discretion.

## IV.

PNC next contends that the district court erred by awarding punitive damages without a showing that Allegiant engaged in self-dealing. But PNC's favored authority, *Koester v. American Republic Investments, Inc.*, 11 F.3d 818 (8th Cir. 1993), did not hold that self-dealing is a prerequisite to punitive damages. *Koester* reversed an award of punitive damages because none of the fiduciary's actions amounted to "bad motive or legal malice," *id*. at 823, but the court did not establish that self-dealing is the only misconduct that could be sufficient to meet the standard.

PNC argues alternatively that clear and convincing evidence did not establish that Allegiant acted with evil motive or reckless indifference. The district court based the punitive damages award on two findings of evil motive or reckless indifference. First, the court found that Allegiant's administration of the trusts during its tenure as trustee showed "reckless disregard for the beneficiaries." Ample evidence supports this conclusion. As discussed, Allegiant exercised no oversight of the trusts after delegating control over the assets to NPS and Wulf, and Allegiant failed to keep adequate records of funds coming in and out of the trusts.

Second, the district court relied on trust administrator Morisse's conduct during the transfer of the trusts to Bremen Bank and his false testimony at trial in this case. Morisse failed to provide Bremen with documents about the Lincoln insurance policies, instructed Bremen personnel to not verify insurance values provided by NPS, and told the personnel to "distribute 'the income out that was on the books' rather than performing the calculation in accordance with Chapter 436." This

-12-

evidence supports the district court's finding that Morisse "willfully" led Bremen "away from learning the legal obligations it would be accepting" by agreeing to the transfer.

The district court also cited the "knowing[], willful transfer of the worthless World Services Group Policy to Bremen," including Morisse's false representation that the policy was worth more than $13.5 million. The policy was not a trust asset, and even though Morisse "could find no evidence to support the existence of the . . . policy," he "not only did not take it off the records, he then prepared a document" assigning the policy to Bremen. At trial, Morisse continued to insist he believed the World Services Policy existed, and the district court found that he gave false testimony.

Considered in its entirety, this evidence supports an award of punitive damages. Although the harsh remedy of punitive damages "should be applied only sparingly," *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 110 (Mo. 1996), and not every breach of fiduciary duty warrants an award of punitive damages, *Koester*, 11 F.3d at 823, the district court appropriately concluded that Allegiant's egregious breach of trust in this case justified the award. In addition to Allegiant's failure to oversee the trusts, the court permissibly considered Allegiant's conduct in the Bremen transfer and Morisse's false testimony. Although those latter acts did not themselves result in compensatory damages, a court may consider other acts of a defendant, "both preceding as well as following the particular acts for which damages are sought," if those acts are "so connected with the particular acts as tending to show defendant's disposition, intention, or motive in the commission of the particular acts for which damages are claimed." *Harris v. Jungerman*, 560 S.W.3d 549, 562 (Mo. Ct. App. 2018) (quoting *Charles F. Curry & Co. v. Hedrick*, 378 S.W.2d 522, 536 (Mo. 1964) (per curiam)). The record supports the district court's finding that Allegiant's conduct in the Bremen transfer and Morisse's false testimony were "part of a pattern and practice of misconduct" that enabled NPS's fraudulent scheme to persist

-13-

throughout Allegiant's term as trustee. *See id*. We thus conclude that the district court did not err in awarding punitive damages.

V.

Finally, PNC disputes the district court's award of attorney's fees. Missouri substantive law governs whether attorney's fees are available in this diversity action. We review the district court's legal conclusions *de novo*, and the amount of an award for abuse of discretion. *Padden Law Firm, PLLC v. Toyota Motor Corp.*, 956 F.3d 1069, 1073 (8th Cir. 2020).

PNC asserts that the district court lacked authority under Missouri law to award attorney's fees. Under the traditional American Rule, "absent statutory authorization or contractual agreement . . . each litigant must bear his own attorney's fee." *Trs. of Clayton Terrace Subdivision v. 6 Clayton Terrace, LLC*, 585 S.W.3d 269, 285 (Mo. 2019) (quoting *Incline Vill. Bd. of Trs. v. Edler*, 592 S.W.3d 334, 341 (Mo. 2019)). Missouri has recognized a so-called "special circumstances" exception that permits the award of attorney's fees in cases involving "intentional conduct that was spiteful, fraudulent, or groundless." *Id.* at 286.

PNC argues the special circumstances exception applies only in declaratory judgment actions, and that the district court erred by invoking it in this breach of trust action. That contention is foreclosed by *Kelly v. Golden*, 352 F.3d 344 (8th Cir. 2003), which upheld a fee award based on special circumstances in a case involving causes of action in contract and tort. *Id*. at 352. No decision of the Missouri Supreme Court has superseded *Kelly*; the Missouri court recently assumed without deciding that the exception applies in non-declaratory judgment cases. *Clayton Terrace*, 585 S.W.3d at 286.

-14-

PNC contends alternatively that the district court erred in concluding that Allegiant engaged in intentional misconduct that justified a fee award. The district court found that Allegiant committed intentional misconduct, including when it "knowingly provided NPS and the Cassitys unfettered access to the trust funds" to the detriment of the beneficiaries. The court also found that trust administrator Morisse committed intentional misconduct when he "transferr[ed] a worthless asset to Bremen Bank" and "knowingly g[ave] false testimony throughout this bench trial." These findings are supported by the record, and they are sufficient to support an award of fees under the special circumstances exception to the American Rule. *See State ex rel. Vescovo v. Clay County*, 589 S.W.3d 575, 590 (Mo. Ct. App. 2019).

PNC complains that the fee award was too high because the appellees enjoyed only "limited success" in securing a judgment for $100 million. PNC contends that the fee award should have been reduced because appellees recovered under only one of three theories that they advanced initially. According to PNC, the successful theory—a claim for "loss or depreciation in value of the trust estate" under Restatement (Second) of Trusts § 205(a)—differs from claims for profit "made . . . through the breach" or "profit which would have accrued . . . if there had been no breach" under § 205(b) and (c), respectively. The Restatement, however, describes the subsections as "[a]lternative *remedies* for breach of trust," *id.* § 205 cmt. a (emphasis added), not as separate theories of liability, so the appellees recovered on their single theory of liability. In any event, the claims involved similar facts and issues, so there was no requirement to reduce the fees. *See Hensley v. Eckerhart*, 461 U.S. 424, 434-35 (1983); *Wallace v. DTG Operations, Inc.*, 563 F.3d 357, 363 (8th Cir. 2009). For example, PNC argues that the claim under § 205(b) that Allegiant breached its duty of loyalty when transferring the trusts to Bremen Bank was separate from the underlying breach of trust claim against Allegiant under § 205(a). But Allegiant's transfer of the trusts to Bremen, and in particular Morisse's conduct in preparing for the transition, was relevant to the punitive damages claim for Allegiant's breach of trust.

-15-

PNC also suggests that the attorney's fee award should have been reduced because the award of prejudgment interest "was less than 11 percent of even the smallest interest award Plaintiffs sought." Even so, appellees recovered $12 million in prejudgment interest, and we have held that a comparable degree of success on a claim for damages did not necessitate a reduction in the lodestar amount of fees when the damages award was nonetheless substantial. *Allen v. Tobacco Superstore, Inc.*, 475 F.3d 931, 944 (8th Cir. 2007). No reduction in fees was required here.

\*       \*       \*

The judgment of the district court is affirmed.

_____