# United States Court of Appeals

## For the Eighth Circuit

_____

No. 21-1121

_____

S&H Farm Supply, Inc.

*Plaintiff - Appellee*

v.

Bad Boy, Inc.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: September 22, 2021
Filed: January 31, 2022

_____

Before SMITH, Chief Judge, GRUENDER and STRAS, Circuit Judges.

_____

GRUENDER, Circuit Judge.

S&H Farm Supply, an operator of farm-equipment dealerships, sued Bad Boy, a manufacturer of zero-turn lawn mowers, alleging that Bad Boy's termination of its dealership agreement was an unlawful breach of contract and a violation of Missouri's outdoor power equipment statute, Missouri Revised Statutes Section

407.898.  The district court[1] entered judgment on the jury verdict in favor of S&H. Bad Boy appeals the denial of its motion for judgment as a matter of law and its motion for a new trial, as well as the award of attorney's fees, expenses, and bill of costs.  We affirm.

## I.

S&H operates farm-equipment dealerships in Joplin, Lockwood, Mountain Grove, and Rogersville, Missouri.  In 2012, Eric Schnelle acquired his father Wayne Schnelle's ownership interest in S&H and took over as president and owner of the company.  Bad Boy manufactures zero-turn lawn mowers and contracts with independent dealerships to sell its mowers to consumers.

S&H became an authorized dealer of Bad Boy mowers when the two companies entered an oral agreement in March of 2008.  The agreement created protected sales territories around each S&H store ("protected territory") in which S&H had exclusive rights to sell Bad Boy mowers.  However, the parties dispute the size of this protected territory, which S&H claims (but Bad Boy denies) was 30-to-35 miles measured "as the crow flies" around each S&H store.  The parties also dispute whether their oral agreement included a growth requirement for sales.

Between 2016 and 2018, S&H's sales of Bad Boy mowers declined significantly.  Compared to 2015, S&H sold 91 fewer mowers in 2016, 234 fewer mowers in 2017, and 342 fewer mowers in 2018.  Gross revenue dropped to a low of $2 million in 2018 as compared to $3.8 million in 2015.  During this time, S&H began to sell a competing brand of mowers called Spartan, and Bad Boy allowed ten new dealerships within a thirty-five-mile radius of S&H stores to sell Bad Boy mowers.

---

[1]The Honorable Beth Phillips, Chief Judge, United States District Court for the Western District of Missouri.

In September 2018, Bad Boy terminated the agreement with S&H because of the decline in sales, which it argued was due to S&H's sales of Spartan mowers. S&H sued Bad Boy two months later, pleading two causes of action. First, S&H alleged that Bad Boy breached the oral agreement by allowing other dealerships within the protected territory to sell Bad Boy mowers and by terminating the agreement in retaliation for S&H selling Spartan mowers. Second, S&H alleged that Bad Boy violated the outdoor power equipment statute, Missouri Revised Statutes Section 407.898, by terminating the agreement without good cause.

The case was tried to a jury in late 2020. S&H called as witnesses the president and owner of S&H, Eric Schnelle; the general manager of the Joplin location of S&H, Phillip Oeltjen; the general manager of the Rogersville store, Caleb Wehrman; and its expert Wayne Brown, whose testimony the district court admitted over Bad Boy's objection. Brown concluded that S&H lost past profits of $642,000 and future profits of $5,237,000 because of the termination. Bad Boy cross-examined Brown and called its own expert witness to dispute his conclusions.

At the close of evidence, Bad Boy moved for judgment as a matter of law on both claims. The district court denied the motion. The jury found in favor of S&H and awarded $642,000 in damages for the breach-of-contract claim and $5,237,000 for the statutory claim. Bad Boy then filed a renewed motion for judgment as a matter of law and, in the alternative, a motion for a new trial. The district court denied both motions. The district court also granted in part S&H's motion for attorney's fees, expenses, and bill of costs.

Bad Boy appeals the district court's denial of its motion for judgment as a matter of law; the admission of Brown's testimony; the jury instructions; and the award of attorney's fees, expenses, and bill of costs.

## II.

Bad Boy argues that the district court erred in denying its motion for judgment as a matter of law. "We review the denial of a motion for judgment as a matter of law *de novo*, viewing the evidence in the light most favorable to the jury verdict." *Borchardt v. State Farm Fire & Cas. Co.*, 931 F.3d 781, 784 (8th Cir. 2019). We will "reverse the jury's verdict only if no reasonable juror could have returned a verdict for the non-moving party." *Procknow v. Curry*, 826 F.3d 1009, 1013 (8th Cir. 2016) (internal quotation marks omitted).

### A.

We begin with the breach-of-contract claim. In this diversity case, Missouri substantive law applies. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). To prevail on a breach-of-contract claim under Missouri law, the plaintiff must prove "(1) the existence of a valid contract; (2) the rights and obligations of each party; (3) a breach; and (4) damages." *Kieffer v. Icaza*, 376 S.W.3d 653, 657 (Mo. 2012). The damages must have been caused by the breach. *Curators of Univ. of Mo. v. Suppes*, 583 S.W.3d 49, 61 (Mo. Ct. App. 2019). Missouri recognizes oral contracts as "valid and enforceable." *See Piazza v. Combs*, 226 S.W.3d 211, 222 (Mo. Ct. App. 2007). A valid contract requires "a mutuality of assent by the parties to the terms of the contract, i.e., a meeting of the minds." *Women's Care Specialists, LLC v. Troupin*, 408 S.W.3d 310, 315-16 (Mo. Ct. App. 2013). We "look to the objective manifestations of the parties" in determining whether a meeting of minds occurred. *Grant v. Sears*, 379 S.W.3d 905, 916 (Mo. Ct. App. 2012) (bracket omitted).

Bad Boy argues that the district court erred in denying its motion for judgment as a matter of law on the breach-of-contract claim because S&H failed to present sufficient evidence to prove two required elements of the claim: the existence of a valid contract and that the alleged damages were caused by the breach.

-4-

1.

First, Bad Boy argues that S&H failed to prove the existence of a valid contract because there was no evidence of mutual assent for the scope of the protected territory. According to Bad Boy, S&H did not prove a meeting of the minds as to a 30-to-35-mile radius, and even if it had, it did not prove a meeting of the minds as to whether this radius was to be measured as the crow flies or by driving distance.

We disagree. Bad Boy argues that Schnelle's testimony regarding the size of the protected territory was equivocal, emphasizing that he recalled "talk[ing with Bad Boy] about space in general" and only "kind of lock[ing] down on . . . 30 to 35 miles as a reasonable area." Furthermore, Schnelle admitted on cross-examination that he settled on that number only after being "grilled . . . to pick mileage" during a deposition. But Schnelle reiterated the 30-to-35-mile figure more definitively at other points during his testimony. It was within the province of the jury to assess Schnelle's credibility and resolve conflicting testimony, *see Taylor v. Otter Tail Corp.*, 484 F.3d 1016, 1020 (8th Cir. 2007), and a reasonable jury could rely on Schnelle's testimony supporting S&H's position that the protected territory was 30-to-35 miles to do so.

The jury also had the Eubanks email to rely upon when evaluating the question of how the distance was to be measured. In that letter, Eubanks observed that the nearest distance between his proposed store and an S&H dealership would be "between 35.4 to 41.7 miles" by car. Relying on that point, Eubanks stated that "[i]t was [his] understanding that if [h]e stayed 30 to 35 miles away [from S&H's nearest store,] that would be [far] enough" away to open a competing dealership. Because Eubanks' proposed location would not fall within S&H's protected territory if the parties were measuring the distance by car—but it would fall within that territory if the parties were measuring "as the crow flies"—the jury could reasonably infer that Bad Boy rejected Eubanks's request because it thought the dealership agreement

required it.  The email, in other words, could have led the jury to conclude that Bad Boy thought it had to measure S&H's protected territory "as the crow flies."

As for whether the distance was to be measured as the crow flies or by driving distance, Bad Boy points out that Schnelle admitted that this issue "wasn't discussed specifically."  But Schnelle also testified that "[g]enerally in our business when we're talking about [a protected territory], we talk about drawing a circle around the dealership, and that's a radius. . . . In my world, it's radius, it's as the crow flies. . . . With other brands, it's crow-flies."  A reasonable jury could conclude from this testimony that the crow-flies measurement is an industry standard and that no discussion in negotiations was necessary.  *See Mann Bros. Logging, Inc. v. Potlatch Corp.*, 149 F.3d 790, 794 (8th Cir. 1998) (finding testimony that behavior was an industry standard to be sufficient evidence).  The jury also had the Eubanks email to rely upon when evaluating the question of how the distance was to be measured.  In that letter, the shortest route mentioned was more than 35 miles ("35.4 to 41.7") by driving distance.  Bad Boy's denial of Eubanks's request suggests that Bad Boy understood that the protected territory was not measured by driving distance.  Eubanks's letter could also lead a reasonable jury to believe that a radius was the understanding between the parties.  *See Title Guar. & Sur. Co. v. Mo. ex rel. Stormfeltz*, 105 F.2d 496, 523 (8th Cir. 1939) (finding written testimony to be sufficient evidence from which a jury could infer "mutual understanding[]").

Looking at the evidence as a whole and viewing it in the light most favorable to the verdict, we conclude that the evidence was sufficient for a reasonable jury to find that there was mutual assent as to the size and measurement of the protected territory.

2.

Second, Bad Boy argues that S&H failed to present sufficient evidence for a reasonable jury to find that the alleged breach caused any damages.  "To recover lost profits stemming from a breach of contract, a plaintiff need only prove the fact of damages with reasonable certainty and provide an adequate basis for the jury to

estimate the lost profits with reasonable certainty." *Khalil v. 3HB Corp.*, 621 S.W.3d 1, 8 (Mo. Ct. App. 2021). "'Certainty' means that damages have been suffered and not exact proof of the amount of the damages." *Suppes*, 583 S.W.3d at 61.

Between 2016 and 2018, S&H suffered a significant decline in sales of Bad Boy mowers. S&H sold 91 fewer mowers in 2016 than 2015, 234 fewer mowers in 2017, and 342 fewer mowers in 2018. This represents a fifty percent drop in sales. As compared to $3.8 million in 2015, gross revenue dropped to a low of $2.0 million in 2018.

Bad Boy suggests that S&H presented no evidence that its damages were caused by the alleged breach of contract. Bad Boy argues that Brown offered an opinion only on the amount of lost profits, not the cause. And it notes that Schnelle identified reasons for S&H's sales decline beyond Bad Boy's introduction of dealerships, including external competition, S&H's decision to start selling Spartan mowers, reduced farm income, and bad mowing weather. Wehrman, the general manager of the S&H store in Rogersville, testified that external competition was a significant factor in S&H's sales decline.

But the potential for other causes does not render insufficient the evidence presented by S&H that Bad Boy's introduction of dealerships was the primary cause of the decline in sales. On direct examination, Schnelle testified that, during the relevant time frame, "the [number one] reason why my sales were declining was all of the new dealers in my area." Wehrman testified that the primary reason sales were declining at his store was "way more Bad Boy dealers in the area than there had ever been, so that was taking some sales away." Schnelle testified that some customers no longer travelled to S&H from areas with new dealerships and that his salesmen reported sales lost to competing dealerships. Oeltjen, the general manager of the Joplin location of S&H, suggested that the "major contributor" of declining Bad Boy sales was the new competition from other dealers. He testified that customers began coming in regularly shopping for parts and service for a mower purchased from nearby dealerships. Although Bad Boy presented a relationship

-7-

between declining Bad Boy sales and increasing Spartan sales in S&H stores, S&H presented a relationship between declining Bad Boy sales and new dealerships appointed by Bad Boy. S&H countered Bad Boy's theory with one of its own and presented testimony to support it. There was sufficient evidence that a reasonable jury could have chosen S&H's theory about the cause of the lost profits. *See McGee v. Hester*, 815 F.2d 1193, 1196 (8th Cir. 1987) (finding that plaintiff's evidence of lost sales and employee testimony about lost customers was sufficient to support the jury's determination that defendant's actions interfered with sales).

## B.

Next, we turn to Bad Boy's challenge to the sufficiency of the evidence of S&H's outdoor power equipment statute claim, which provides:

> Any manufacturer, wholesaler or distributor of outdoor power equipment used for lawn, garden, golf course, landscaping or grounds maintenance, and repair parts therefor, who enters into a written or parol contract with any person, firm, or corporation engaged in the business of selling and repairing outdoor power equipment used for lawn, garden, golf course, landscaping or grounds maintenance and repair parts therefor, whereby such retailer agrees to maintain a stock of parts or complete or whole machines or attachments, shall not terminate, cancel, or fail to renew any such contract without good cause.

Mo. Rev. Stat. § 407.895. Bad Boy argues that it was entitled to judgment as a matter of law on S&H's statutory claim because S&H failed to present sufficient evidence on two required elements of its claim: that Bad Boy terminated the agreement "without good cause," *id.*, and that S&H incurred damages as a result, *see Suppes*, 583 S.W.3d at 61.

1.

First, Bad Boy argues that S&H presented insufficient evidence for the jury to conclude that Bad Boy lacked good cause to terminate the agreement. "'Good cause' means failure by the retailer to substantially comply with essential and reasonable requirements imposed upon the retailer by the contract if such requirements are not different from those requirements imposed on other similarly situated retailers . . . ." Mo. Rev. Stat. § 407.895.

Bad Boy points to Schnelle's testimony that S&H agreed to prioritize the promotion of Bad Boy products and to grow the Bad Boy brand. Between 2016 and 2018, S&H's sales of Bad Boy mowers declined steadily to eventually fifty percent of its 2015 sales. Bad Boy attributes this decline to S&H's sales of competing Spartan mowers and cites it as the reason for the termination of the dealership agreement in September 2018. Bad Boy claims that no evidence showed "that it was unreasonable for Bad Boy to terminate a dealer with a three-year pattern of declining sales" or "that [S&H] was treated differently from other similarly-situated Bad Boy dealers." Thus, Bad Boy concludes that "there was no evidence to show that Bad Boy lacked 'good cause' to terminate its dealership agreement based on three years of declining sales."

We disagree. First, a reasonable jury could conclude that the dealership agreement did not include a specific sales-growth requirement. Schnelle testified that the dealership agreement did not require a certain number of mower sales each year and that there was no requirement to grow sales each year. Second, even if the dealership agreement included a specific sales-growth requirement, a reasonable jury could find a lack of good cause for terminating the agreement based on Bad Boy's introduction of Bad Boy dealerships within the protected 30-to-35-mile radius of S&H's dealerships. *See supra* Section II.A.2. Thus, S&H presented sufficient evidence that Bad Boy did not have good cause to terminate the dealership agreement.

2.

Bad Boy also argues that S&H presented insufficient evidence to show that $5.2 million in "lost profits" damages resulted from Bad Boy's introduction of dealerships within S&H's protected territory. Bad Boy argues that, because expert Wayne Brown's methodology was flawed, S&H failed to provide sufficient evidence of the "fact of damages." *See Suppes*, 583 S.W.3d at 61. But Bad Boy is entitled to judgment as a matter of law only if S&H failed to present sufficient evidence of the fact of any damages caused by the termination. *See id.* We conclude that S&H presented sufficient evidence that a reasonable jury could find that S&H lost some amount of profits as a result of Bad Boy's introduction of dealerships within S&H's protected territory. In Missouri, a plaintiff seeking recovery of lost profits need only "provide evidence of the income and expenses of the business for a reasonable time before the interruption caused by defendant's actions, with a consequent establishing of the net profits during the previous period." *Wandersee v. BP Prods. N. Am., Inc.,* 263 S.W.3d 623, 633 (Mo. 2008) (en banc). That is exactly what Brown did at trial, and a reasonable jury could credit that testimony, as it did here, when it returned an award that was identical to Brown's damages calculation. Therefore, the district court properly denied Bad Boy's motion for a judgment as a matter of law.

**III.**

Next, we turn to Bad Boy's argument that it is entitled to a new trial. "We review the denial of a motion for a new trial for an abuse of discretion." *Southland Metals, Inc. v. Am. Castings, LLC*, 800 F.3d 452, 461 (8th Cir. 2015).

A.

Bad Boy argues that the district court abused its discretion by admitting Brown's testimony regarding past and future profits that S&H lost as a result of Bad Boy's introduction of dealerships in the protected territory and termination of the

-10-

dealership agreement. We review a district court's decision to admit evidence for an abuse of discretion. *Gareis v. 3M Co.*, 9 F.4th 812, 817 (8th Cir. 2021). Even if we conclude that the district court abused its discretion, we will reverse a jury verdict only if the improper expert opinion had a "substantial influence" on the verdict. *Id.*

In a diversity case, the Federal Rules of Evidence govern the admissibility of evidence. *Hirchak v. W.W. Grainger, Inc.*, 980 F.3d 605, 608 (8th Cir. 2020). Under Rule 702, district courts serve a "gatekeeping function," admitting expert testimony only if it "is not only relevant, but reliable." *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 776-77 (8th Cir. 2021). Accordingly, "a district court may exclude expert testimony if it finds 'that there is simply too great an analytical gap between the data and the opinion proffered.'" *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). That said, Rule 702 is a rule "of admissibility rather than exclusion." *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1298 (8th Cir. 1997) Thus, the "general rule" is that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." *In re Bair Hugger*, 9 F.4th at 778.

In the context of damages, this means that an expert need not explore every possible methodology of estimating lost profits. *See S.E.C. v. Das*, 723 F.3d 943, 950 (8th Cir. 2013). It is sufficient that the expert's methodology is valid. *See id.* ("[W]hile other methods for calculating damages may be available, so long as the methods employed are scientifically valid, Appellants' mere disagreement with the assumptions and methodology used does not warrant exclusion of expert testimony."). Constructing trends based on historical evidence is a valid methodology for estimating damages. *Wash Sols., Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888, 893 (8th Cir. 2005) ("For established businesses, expected future profits may be extrapolated with reasonable certainty from historical evidence of the income and expenses of the business prior to the damaging event."); *see W. Plains, L.L.C. v. Retzlaff Grain Co.*, 870 F.3d 774, 789-90 (8th Cir. 2017).

Here, Brown reviewed S&H's historical financial data from the relevant period of the contract, including tax returns, sales reports, and other accounting documents. After discounting sales results that seemed unusually high, Brown determined that the lowest annual growth rate in S&H's sales of Bad Boy mowers between 2011 and 2015 was ten percent. Brown then applied this ten percent annual growth rate to S&H's 2015 sales of Bad Boy mowers to estimate what S&H's sales would have been beginning in 2016 but for the introduction of Bad Boy dealerships in S&H's protected territory and Bad Boy's termination of the dealership agreement.

Bad Boy argues that the district court abused its discretion by admitting Brown's opinions because there was too great an analytical gap—a "yawning chasm"—between the data and Brown's conclusions. According to Bad Boy, Brown should have accounted for the possibility that additional factors such as "the competing Spartan mowers, external competition from Hustler, and poor mowing weather in 2018" might have depressed S&H's sales of Bad Boy mowers below historical trends.

We agree with S&H that Brown's omission of these factors from his model affects only "the weight of the testimony, not its admissibility." *See Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006). Brown used and thoroughly explained a valid methodology for estimating past and future lost profits. *See W. Plains*, 870 F.3d at 789-90; *Wash Sols.*, 395 F.3d at 893. Bad Boy was free to challenge—in fact, did challenge—Brown's assumptions during cross-examination. That Brown's opinion was open to such challenges cannot be sufficient to mandate exclusion; otherwise, expert testimony on lost profits would rarely be admissible because every model relies on assumptions and no model can account for every conceivably relevant factor. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Hill v. Sw. Energy Co.*, 858 F.3d 481, 485-88 (8th Cir. 2017) (reversing the exclusion of an expert simply because he used "simplifying assumptions" in order to create a "rough

-12-

model" that did not account for all possible factors); *Tussey v. ABB, Inc.*, 746 F.3d 327, 337 (8th Cir. 2014) (affirming the admission of expert testimony when the opposing party "had a full opportunity to test [the expert] and his methodology on cross-examination, which they did"). The district court did not abuse its discretion in admitting Brown's lost profits evidence.

B.

Bad Boy also argues that the jury instructions were improper. In a diversity case, state law controls the substance of the jury instructions. *All-Ways Logistics, Inc. v. USA Truck, Inc.*, 583 F.3d 511, 515 (8th Cir. 2009). We review both the instructions provided to the jury and the related denial of a motion for a new trial for an abuse of discretion, *Oriental Trading Co. v. Firetti*, 236 F.3d 938, 946 (8th Cir. 2001), but we review *de novo* whether the district court correctly interpreted state law, *Arkwright Mut. Ins. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1180 (8th Cir. 1997). Our review of the jury instructions is "limited to a determination of whether the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and accurately submitted the issues to the jury." *Slidell, Inc. v. Millennium Inorganic Chems., Inc.*, 460 F.3d 1047, 1054 (8th Cir. 2006). The court need not adopt the language offered by the parties but must give an "instruction reflecting [a] party's theory of the case if the instruction is legally correct and there is evidence to support it." *Essco Geometric v. Harvard Indus.,* 46 F.3d 718, 727 (8th Cir. 1995). "As long as the district court correctly instructed the jury on the substantive issues, we allow the district court to exercise its sound discretion in selecting the actual form and language of jury instructions." *Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*, 434 F.3d 1081, 1093 (8th Cir. 2006) (internal quotation marks omitted). Jury instructions need not be "technically perfect or even a model of clarity." *Hall v. BNSF Ry. Co.*, 958 F.3d 672, 674 (8th Cir. 2020).

1.

Bad Boy challenges Jury Instruction No. 17., which conditions a verdict of breach of contract on the finding that "Bad Boy agreed to provide S & H with a protected territory wherein Bad Boy would not establish new Bad Boy dealers." Bad Boy argues that the jury was not asked to determine a significant contested issue: whether the parties agreed that the protected territory was 30-to-35-miles. Specifically, it claims that "th[e] issue" was not "hypothesized in the verdict directing instruction." *See Meridian Creative All., LLC v. O'Reilly Auto. Stores, Inc.*, 519 S.W.3d 839, 842 (Mo. Ct. App. 2017). Instead, Bad Boy proposed a jury instruction that would have required a finding that "Bad Boy . . . agreed to provide S&H Farm Supply, Inc. an exclusive sales territory of 30 to 35 miles around each S&H Farm Supply, Inc. store."

The district court did not abuse its discretion in allowing Jury Instruction No. 17. Instruction 17 required the jury to find that S&H had a protected territory and that Bad Boy allowed dealerships within that territory to sell its products. That sufficiently places the question before the jury. In order to find a breach of the protected territory, the jury necessarily had to determine the size and form of measurement of the protected territory. Further, the disputes about both the size of the protected territory and how to measure it were discussed throughout the trial. Indeed, the parties even stipulated that ten new dealerships were allowed to sell Bad Boy mowers within a 30-to-35-mile radius of an S&H store "as the crow flies" during the relevant time period. Thus, "the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *See Druckmaschinen Aktiengesellschaft*, 434 F.3d at 1093.

2.

We also reject Bad Boy's argument that the district court abused its discretion in refusing Bad Boy's proposed "good cause" instruction. Instruction No. 15 defined "good cause" termination under Section 407.895, but it did not include reference to

the first of eight "addition[al]" instances of good cause listed in the statute. The statute provides that good cause exists whenever "there has been a withdrawal from the retailer's business of a[] . . . major shareholder, or the manager of the retailer's business, or there has been a substantial reduction in interest of a partner or major stockholder without the written consent of the manufacturer." Mo. Rev. Stat. § 407.895(1). The parties disagree about whether the statute requires the termination of the dealership agreement to be caused by the ownership transfer. Bad Boy argues that the district court abused its discretion when it failed to instruct the jury on this ground for the 2018 termination of the dealership agreement because of the transfer of Wayne Schnelle's ownership interest in S&H to his son Eric in 2012. Bad Boy's proposed instruction included: "As used in these instructions, 'good cause' means any of the following: . . . That there was a withdrawal from S&H Farm Supply, Inc.'s business of a major shareholder, or there was a substantial reduction in interest of a major stockholder without the written consent of Bad Boy, Inc."

However, Bad Boy failed to present evidence of the amount of shares owned by Wayne Schnelle from which a jury could determine that he was a "major shareholder" or "major stockholder." Additionally, Bad Boy presented no evidence that the dealership agreement was terminated because of Wayne Schnelle's departure. The district court correctly reasoned that Section 407.895 requires both that "the manufacturer have a reason for terminating the agreement" and that the reason "constitute good cause." Thus, the district court did not abuse its discretion by refusing to instruct the jury about the ownership transfer where there was no evidence that Bad Boy terminated the agreement with good cause. *See Essco*, 46 F.3d at 727 (stating that a party is entitled to an instruction reflecting its theory of the case if there is evidence to support it and it is legally correct).

## IV.

Finally, Bad Boy challenges the award of attorney's fees, expenses, and bill of costs. The district court awarded $592,003.50 in attorney's fees and $10,575.46 in expenses under Missouri Revised Statutes Section 407.898, and $21,437.50 in

costs pursuant to 28 U.S.C. § 1920. We review for an abuse of discretion an award of attorney's fees, *Vines v. Welspun Pipes Inc.*, 9 F.4th 849, 855 (8th Cir. 2021), expenses, *Hernandez v. Bridgestone Americas Tire Operations, LLC*, 831 F.3d 940, 945 (8th Cir. 2016), and costs, *Dindinger v. Allsteel, Inc.*, 853 F.3d 414, 431 (8th Cir. 2017). "Missouri substantive law governs whether attorney's fees are available in this diversity action." *Jo Ann Howard & Assocs., P.C. v. Nat'l City Bank*, 11 F.4th 876, 887 (8th Cir. 2021). In awarding attorney's fees, Missouri follows the American Rule, which requires parties to pay their own attorney fees unless their contract or a statute authorizes otherwise. *Darks v. Jackson Cnty.*, 601 S.W.3d 247, 261 (Mo. Ct. App. 2020). Under Federal Rule of Civil Procedure 54(d), "[a] prevailing party is presumptively entitled to recover all of its costs." *In re Derailment Cases*, 417 F.3d 840, 844 (8th Cir. 2005). "However, such costs must be set out in 28 U.S.C. § 1920 or some other statutory authorization." *Smith v. Tenet Healthsystem SL, Inc.*, 436 F.3d 879, 889 (8th Cir. 2006). "District courts have substantial discretion in awarding costs under Rule 54(d)." *Id.* Here, S&H's request for attorney's fees and expenses is based on Missouri's outdoor power equipment statute, which provides that the "retailer may bring an action against such manufacturer, wholesaler, or distributor in any court of competent jurisdiction for damages sustained by the retailer as a consequence of the violation, together with the actual costs of the action, including reasonable attorney fees." Mo. Rev. Stat. § 407.898. Its request for costs is based on 28 U.S.C. § 1920.

Bad Boy challenges the award of attorney's fees, expenses, and bill of costs, arguing that the district court improperly awarded them for S&H's breach of contract claim. However,

> if the claims for relief have a common core of facts and are based on related legal theories and much of counsel's time is devoted generally to the litigation as a whole making it difficult to divide the hours expended on a claim-by-claim basis, such a lawsuit cannot be viewed as a series of distinct claims.

*Alhalabi v. Mo. Dep't of Nat. Res.*, 300 S.W.3d 518, 530-31 (Mo. Ct. App. 2009); *see also Holmes v. Kansas City Mo. Bd. of Police Comm'rs ex rel. Its Members*, 364 S.W.3d 615, 630 (Mo. Ct. App. 2012) ("[I]f the claims are so intertwined, with the legal work overlapping by the claims' shared legal theory and facts, then the attorney fees awarded should reflect the work expended on all the claims.").

The district court awarded $592,003.50 in attorney's fees and $10,575.46 in expenses under Section 407.898, and $21,437.50 in costs pursuant to 28 U.S.C. § 1920. We reject Bad Boy's argument that the award of attorney's fees and expenses must be vacated because the district court did not exclude fees and expenses related to the breach of contract claim. Here, the breach of contract claim and the statutory claim share a "common core of facts and are based on related legal theories," *see Alhalabi*, 300 S.W.3d at 530-31, because S&H claims that Bad Boy's termination of the agreement constituted both a breach of contract and a violation of Section 407.898. Furthermore, when Bad Boy defended against the statutory claim by arguing that the decline in sales constituted "good cause" for termination, S&H countered with evidence that the decline in sales was due to Bad Boy's introduction of dealerships within S&H's protected territory, which S&H argued also constituted a breach of contract. Because the claims are "so intertwined" that there would have been "overlapping" legal work due to the "claims' shared legal theory and facts," the district court did not abuse its discretion in awarding attorney's fees, expenses, and bill of costs. *See Holmes*, 364 S.W.3d at 630.

## V.

For the foregoing reasons, we affirm the judgment of the district court.

_____